**BUILDING SPECIALTIES, INC., Plaintiff,**

v.

**LIBERTY MUTUAL FIRE INSURANCE COMPANY, Defendant.**

**Civil Action No. H–09–0823.**

United States District Court,
S.D. Texas,
Houston Division.

May 17, 2010.

William T. Green, III, Attorney at Law, Houston, TX, for Plaintiff.

Christopher W. Martin, Patrick Michael Kemp, Martin Disiere et al., Houston, TX, for Defendant.

## MEMORANDUM AND OPINION

LEE H. ROSENTHAL, District Judge.

■ This insurance coverage dispute arises out of heating and air conditioning duct work installed in a residence in Houston, Texas. Building Specialties, Inc. was hired by Lone Star Refrigeration, Inc. to install the insulation for the heating and air conditioning system in the residence. Lone Star sued Building Specialties in Texas state court, seeking the cost of repairing and replacing the insulation duct work in one room. The underlying case was settled. Building Specialties then sued its commercial general liability insurer, Liberty Mutual Insurance Company, for the defense costs and indemnity. Liberty Mutual timely removed to this court. The parties have filed cross-motions on the coverage issues. Liberty Mutual has moved for summary judgment that Building Specialties was not entitled to defense or indemnification in the underlying suit. (Docket Entry No. 9). Building Specialties cross-moved for partial summary judgment that the commercial general liability policy covered the underlying suit and that the exclusions Liberty Mutual relies on to deny coverage do not apply. (Docket Entry No. 10).

Based on the pleadings, the motions and responses, the record, and the applicable law, this court grants Liberty Mutual's motion for summary judgment and denies the cross-motion filed by Building Specialties. Final judgment is entered by separate order. The reasons for these rulings are set out in detail below.

## I. Background

### A. The Underlying Lawsuit

Lone Star contracted with Building Specialties to install heating and air conditioning insulation for a residential construction project in Houston, Texas. Building Specialties purchased the insulation material from Knauf Insulation GMBH ("Knauf"). According to an affidavit filed in this coverage suit by John Juzswik, the president of Building Specialties, the homeowner and Lone Star later asserted that in one room

of the house—a ballroom—water or condensate was leaking from the air conditioning grills and damaging an expensive hardwood floor. Juzswik's affidavit states that an unidentified person at Lone Star said that because there was no attic or crawl space above the ballroom, the entire ceiling had to be demolished in order to identify the source of the leak or condensation and remedy it. The cost of tearing down the ceiling, identifying and fixing the problem, and rebuilding and repainting the ceiling was estimated at $215,000. There is no reference in the affidavit to any need to repair the hardwood floor. (Docket Entry No. 14, Ex. 1, Affidavit of John Juzswik).

Lone Star made repeated requests for payment from Building Specialties and Knauf, which refused to pay. (Docket Entry No. 10, Ex. B at 2). In September 2007, Lone Star sued Building Specialties and Knauf in Texas state court. (Docket Entry No. 10, Ex. B). In the original petition, Lone Star alleged that Building Specialties "designed and installed the heating and air conditioning duct work for the project" and that "[s]hortly after the system began operating, defects in the installation of the duct work were discovered." (*Id.* at 2). Lone Star alleged that it "undertook efforts to minimize the damage to repair and replace the defective product and/or installation." (*Id.*). Lone Star alleged it made "repeated demands for payments for the additional work to remedy the problem and fix the damage" but that Building Specialties and Knauf refused to pay. (*Id.*). Lone Star asserted claims for breach of contract, breach of warranty, and negligent misrepresentation. (*Id.* at 3–4).

Building Specialties forwarded the suit to Liberty Mutual. In April 2008, Liberty Mutual replied by letter. (Docket Entry No. 10, Ex. C). The letter stated:

[Lone Star] does not allege that the duct work, or any other portion of the home, was damaged; only that the duct work required repair or remedy in order to work in the manner that [Lone Star] alleges it had hired BSI to design, manufacture and install to meet the homeowner's expectations. [Lone Star] makes no allegation that there was any loss of use of the home. Instead, [Lone Star] only seeks to recover the monies it has expended to remedy or repair the allegedly defective product and/or installation so that the HVAC system operated in a manner expected by the homeowner and which [Lone Star] alleges BSI had been contracted to provide.

(*Id.* at 2). Liberty Mutual stated that there was no "occurrence" under the policy because the only allegations in the suit arose out of faulty products or faulty work and were "thus not considered 'unexpected' and therefore not an accident." (*Id.* at 3). Liberty Mutual also stated that there was no "property damage" under the policy because there was "no allegation of damage to tangible property or loss of use of tangible property." (*Id.*). Liberty Mutual identified exclusions to coverage. Because the "claim centers on the alleged defective installation ('your work') and/or alleged defective materials ('your product')," it was "precluded from coverage under exclusions k (Damage to Your Product) and l (Damage to Your Work)." The letter noted that "the policy's definitions of the terms 'your work' and 'your product' include [ ] warranties or representations made at any time with respect to fitness, quality, durability, performance or use of the 'insured's product.' " As a result, according to the letter, Lone Star's "claims for breach of warranty (express or implied) and negligent misrepresentation fall within these exclusionary provisions." (*Id.*). Liberty Mutual also stated that the "duct work may be considered 'impaired property' in that it is tangible property that was deemed less useful because it

incorporated BSI's product and/or BSI's work that was thought to be defective, deficient, or inadequate" and that therefore Exclusion M, applicable to "Damage To Impaired Property or Property Not Physically Injured" barred coverage. (*Id.* at 4). Finally, Liberty Mutual asserted that Endorsement No. 18, the "Contractors Professional Liability Exclusion," which provided that "the policy does not apply to 'property damage' arising out of the rendering or failure to render any professional services by the named insured or on the named insured's behalf with respect to providing engineering, architectural or surveying services in connection with construction work the named insured performs," barred coverage to the extent the claim arose from the Building Specialties design of the HVAC system. (*Id.*).

Knauf and Lone Star settled the claims between them in the state court suit. Lone Star filed an amended petition that removed references to a defective product but left allegations that Building Specialties defectively installed the duct work. (Docket Entry No. 9 at 4; *id.*, Ex. C). The remaining allegations stated that Building Specialties "designed and installed the heating and air conditioning duct work"; "defects in the installation of the duct work were discovered"; Building Specialties "was made aware of the defective installation and apprised of the situation"; and despite "repeated demands," Building Specialties refused to tender payment for "the additional work to remedy the problem and fix the damage." (*Id.*, Ex. C at 2). Lone Star continued to assert a claim that Building Specialties had breached its contract to "design and install proper and effective heating and air conditioning duct work"; a claim that Building Specialties had breached the one-year "warranty for all materials, equipment and labor furnished by BSI to be free from faulty, defective, or improper workmanship" by failing "to remedy and fix the problem and

to reimburse Plaintiff Lone Star for expenses incurred in repairing the defective work"; and a claim for negligent misrepresentation about the "proper design and installation of air conditioning duct work." (*Id.* at 3–4). Building Specialties eventually settled Lone Star's claims in the underlying litigation for $60,000. (Docket Entry No. 10, Ex. D). This coverage suit followed.

### B. The Coverage Suit

On January 29, 2009, Building Specialties sued Liberty Mutual in Texas state court, alleging breach of the insurance contract. (Docket Entry No. 1, Ex. A). Liberty Mutual removed to this court on the basis of diversity jurisdiction on March 19, 2009. (Docket Entry No. 1). Liberty Mutual moved for summary judgment, (Docket Entry No. 9), Building Specialties responded, (Docket Entry No. 14), and Liberty Mutual replied, (Docket Entry No. 16). Building Specialties also moved for partial summary judgment, (Docket Entry No. 10), Liberty Mutual responded, (Docket Entry No. 15), and Building Specialties replied, (Docket Entry No. 17).

### C. The Policy Terms

Liberty Mutual issued Building Specialties Policy Number TB2–191–437965–035, with effective dates from June 4, 2005 to June 4, 2006. (Docket Entry No. 9–1). The Policy provides, in pertinent part, as follows:

1. **Insuring Agreement**

 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the

insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply....

....

 b. This insurance applies to "bodily injury" and "property damage" only if:

 (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"....

(Docket Entry No. 9, Ex. A § I).

The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.*, Ex. A § V, ¶ 13). "Property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property ... [or] [l]oss of use of tangible property that is not physically injured." (*Id.*, Ex. A § V, ¶ 17). Liberty Mutual contends that as a matter of law, there was no "occurrence" or "property damage" alleged in the underlying suit.

Liberty Mutual also relied on two exclusions in denying a defense to Building Specialties in the underlying litigation:

**2. Exclusions**

This insurance does not apply to:

....

 **k. Damage to Your Product**

 "Property damage" to "your product" arising out of it or any part of it.

 **l. Damage to Your Work**

 "Property damage" to "your work" arising out of it or any part of it and included in the "products completed operations hazard". This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

(*Id.*, Ex. A § 1, ¶ 2(k), (*l*)). The Policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by ... You," including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.' " (*Id.*, Ex. A § V, ¶ 21). The Policy defines "your work" as "[w]ork or operations performed by you or on your behalf; and [m]aterials, parts or equipment furnished in connection with such work or operations." "Your work" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work.' " (*Id.*, Ex. A § V, ¶ 22). The Policy does not define "subcontractor." The parties dispute whether Exclusion K or L, or the exception to Exclusion L, applies.

The coverage issues are analyzed below.

## II. The Applicable Law

### A. The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Stahl v. Novartis Pharms. Corp.,* 283 F.3d 254, 263 (5th Cir.2002). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes XX, Inc.,* 109 F.3d 1070, 1074 (5th Cir.1997). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.

*United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir.2008).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir.2000). The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. *See id.* The nonmovant must do more than show that there is "some metaphysical doubt as to the material facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (per curiam) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Id.* at 255, 106 S.Ct. 2505; *Marathon E.G. Holding Ltd. v. CMS Enters. Co.*, 597 F.3d 311, 316 (5th Cir.2010).

### B. Interpreting Insurance Contracts under Texas Law

In interpreting an insurance policy, a court applies the rules for interpreting contracts generally, reading all parts of the document together and exercising caution not to isolate particular sections or provisions. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex.2003). Viewing the contract in its entirety allows a court to give effect to the written expression of the parties' intent. *Id.* (citing *Tex. Farmers Ins. Co. v. Murphy*, 996 S.W.2d 873, 879 (Tex.1999)); *accord Mid–Continent Cas. Co. v. Swift Energy Co.*, 206 F.3d 487, 491 (5th Cir.2000). In interpreting a policy, a court must read all parts together, giving meaning to each sentence, clause, and word, to avoid making any portion inoperative. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 748 (Tex. 2006). The parties' intent "is governed by what they said, not by what they *intended* to say but did not." *Id.* at 746. The terms used in an insurance contract are given their commonly understood or generally accepted meaning unless otherwise defined in the policy. *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex.2007).

A court construes an unambiguous policy as a matter of law. *Fiess*, 202 S.W.3d at 746. If a policy provision is uncertain or doubtful or is susceptible to more than one reasonable interpretation, it is ambiguous. *Id.; Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). An ambiguity does not arise simply because the parties offer opposing interpretations. *Fiess*, 202 S.W.3d at 746. A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex.2003). If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain its meaning. *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995). The meaning of an ambiguous contract is a question of fact. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex.1996).

The insured initially has the burden to plead and prove that the benefits sought are covered by the insurance policy at issue. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics*

*Corp.*, 532 F.3d 398, 401 (5 th Cir.2008). The insurer bears the burden of establishing that one of the policy's limitations or exclusions constitutes an avoidance or affirmative defense to coverage. *See id.* at 404. Once the insurer demonstrates that an exclusion arguably applies, the burden then shifts back to the insured to show that the claim does not fall within the exclusion or that it comes within an exception to the exclusion. *See Century Surety Co. v. Hardscape Constr. Specialties, Inc.*, 578 F.3d 262, 265 (5th Cir.2009).

■■■ Whether an insurer has a duty to defend the insured is distinct from whether the insurer has a duty to indemnify the insured. *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743 (Tex. 2009). Although Texas courts had previously held that because the duty to defend is broader than the duty to indemnify, if there was no duty to defend, there was no duty to indemnify, the Texas Supreme Court recently held that the duty to indemnify is independent from the duty to defend and an insurer may have a duty to indemnify even if a duty to defend never arises. *Id.* at 744.

■■■ To determine whether an insurer has a duty to defend, Texas courts apply the "eight-corners rule." That rule "provides that when an insured is sued by a third party, the liability insurer is to determine its duty to defend solely from [the] terms of the policy and the pleadings of the third-party claimant." *GuideOne Elite Ins. Co. v. Fielder Road Baptist Church*, 197 S.W.3d 305, 307 (Tex.2006). "Resort to evidence outside the four corners of these two documents is generally prohibited." *Id.* This approach requires that the court compare only the "four corners" of the pleading with the "four corners" of the policy. *Allstate Ins. Co. v. Disability Servs. of the Sw. Inc.*, 400 F.3d 260, 263 (5th Cir.2005) (applying Texas law). When the rule applies, the court

does not examine the merits of the underlying dispute or evidence extrinsic to the policy and the underlying lawsuit pleadings. Whether the insurer must defend is determined as a matter of law because the court need only examine the policy language and the allegations in the underlying petition to make the decision. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Merchants Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex.1997) (per curiam). The court construes the policy language and then examines the factual allegations made in the underlying suit to determine whether those allegations could state a claim covered by the insured's policy. *See id.* An insurer has no legal obligation to defend a suit if the underlying petition does not allege facts that fit within the scope of coverage. *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002). All doubts are resolved in favor of the duty to defend. *Id.*

■■■ In contrast, the "duty to indemnify depends on the facts proven and whether the damages caused by the actions or omissions proven are covered by the terms of the policy." *D.R. Horton–Tex., Ltd.*, 300 S.W.3d at 744. Typically, the court considering the coverage dispute will consider additional evidence needed to establish whether there was coverage in the underlying suit, particularly if the underlying case is resolved without a trial on the merits. *Id.; see also Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Puget Plastics Corp.*, 532 F.3d 398, 404 (5th Cir. 2008) (holding that the trial court can consider evidence regarding facts required to determine coverage that were not adjudicated in the underlying litigation). The trial court is authorized to make factual findings necessary to resolve coverage. *See Puget Plastics Corp.*, 532 F.3d at 404.

## III. Analysis

### A. "Occurrence" and "Property Damage"

Liberty Mutual argues that it owes no duty to defend or indemnify Building Specialties because the underlying lawsuit did not allege an "occurrence" or "property damage." Building Specialties argues that the allegations in the underlying lawsuit and the summary judgment evidence show an "occurrence" and "property damage" under *Lamar Homes, Inc. v. Mid–Continent Casualty Co.*, 242 S.W.3d 1 (Tex. 2007).

#### 1. "Occurrence"

■ The Policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Docket Entry No. 9, Ex. A § V, ¶ 13). The Policy does not define "accident." In *Lamar Homes*, the Texas Supreme Court considered the definition of "occurrence" in a similar policy in answering three questions certified to that court by the United States Court of Appeals for the Fifth Circuit. The two questions relevant to this case were as follows:

1. When a homebuyer sues his general contractor for construction defects and alleges only damage to or loss of use of the home itself, do such allegations allege an "accident" or "occurrence" sufficient to trigger the duty to defend or indemnify under a CGL policy?

2. When a homebuyer sues his general contractor for construction defects and alleges only damage to or loss of use of the home itself, do such allegations allege "property damage" sufficient to trigger the duty to defend or indemnify under a CGL policy?

242 S.W.3d at 4. In the underlying litigation in *Lamar Homes*, homeowners sued the homebuilder and its subcontractor, alleging that negligent design and construction of the house foundation caused cracking in the sheetrock and stone veneer. *Id.* at 10. The homebuilder's commercial general liability insurer refused to provide a defense. *Id.* at 5. The homebuilder sued for a declaration of rights under the policy. *Id.* In considering whether the plaintiff's allegations in the underlying suit were an "occurrence" under the policy, the Texas Supreme Court looked to the "generally accepted or commonly understood meaning" of "accident" as a "fortuitous, unexpected, and unintended event" that "occurs not as the result of natural routine, but as the culmination of forces working without design, coordination, or plan." *Id.* at 8 (quotation omitted). The court explained that an intentional tort cannot be an accident, regardless of the injury caused, but that "a deliberate act, performed negligently, is an accident if the effect is not the intended or expected result; that is, the result would have been different had the deliberate act been performed correctly." *Id.* "[A] claim does not involve an accident or occurrence when either direct allegations purport that the insured intended the injury (which is presumed in cases of intentional tort) or circumstances confirm that the resulting damage was the natural and expected result of the insured's actions, that is, was highly probable whether the insured was negligent or not." *Id.* at 9.

The Texas Supreme Court stressed that whether the allegedly faulty workmanship was an accident for the purpose of triggering a duty to defend depends on the facts and circumstances alleged in the underlying plaintiff's complaint. *Id.* In the underlying suit in *Lamar Homes*, the homeowner plaintiffs had alleged as follows:

... Lamar Homes failed to design and/or construct the foundation of the residence in a good and workmanlike fashion. The defects in Plaintiffs' resi-

dence include, but are not limited to, the following:

i. excessive deflection of foundation;

ii. foundation not constructed sufficiently stiffly to withstand differential movements of soil underlying such foundation;

iii. cracks in the sheetrock and stone veneer of the residence; and,

iv. binding and ghosting doors.

 . . . .

 Plaintiffs will show that Lamar Homes failed to use the skill and care in the performance of its duties commensurate with the requirements of the home building industry in connection with the original design of the foundation and of the residence. The conduct of Lamar Homes therefore constitutes negligence and such negligence was a proximate cause of actual damages to Plaintiffs in an amount within the jurisdictional limits of this court.

*Lamar Homes, Inc. v. Mid–Continent Cas. Co.,* 335 F.Supp.2d 754, 758 (W.D.Tex. 2004), *question certified by* 428 F.3d 193 (5th Cir.2005), *certified question answered by* 242 S.W.3d 1 (Tex.2007), *answer to certified question conformed to* 501 F.3d 435 (5th Cir.2007). The Texas Supreme Court observed that there had been no allegation that the homebuilder intended or expected its work or its subcontractors' work to damage the home. 242 S.W.3d at 9. The Texas Supreme Court held that the homeowner plaintiffs in the underlying litigation had alleged an "occurrence" and answered "yes" to the Fifth Circuit's certified question asking whether an allegation of damage only to the insured's work could constitute a covered "occurrence." *Id.*

 Liberty Mutual points out that in the underlying litigation in the present case, Lone Star did not allege that the defective insulation duct work was a product of negligence by Building Specialties. In the amended petition, Lone Star did not use the words "negligent," "unintentional," or "accidental" to describe the Building Specialties work. Liberty Mutual argues that the lack of those words establishes as a matter of law that the faulty duct work was not an "occurrence." (Docket Entry No. 9 at 8). Building Specialties responds that the *Lamar Homes* opinion does not impose a requirement that specific words be used in an underlying suit to allege an "occurrence." (Docket Entry No. 14 at 2–3). Building Specialties points to the language in another section of the *Lamar Homes* opinion cautioning that an "occurrence" does not require the assertion of specific tort claims in the underlying case. 242 S.W.3d at 13.

 The *Lamar Homes* opinion states that: "the complaint alleges an 'occurrence' because it asserts that Lamar's defective construction was a product of its negligence. No one alleges that Lamar intended or expected its work or its subcontractors' work to damage the … home." *Id.* at 9. The opinion does not make it clear whether the focus is on the presence of negligence allegations or the absence of intent allegations, or whether either is necessary or sufficient.

 In this case, Lone Star's last petition in the underlying case alleged that Building Specialties' work in installing the insulation duct work was defective. The petition stated in relevant part as follows:

 Pursuant to [a] contract, Defendant BSI designed and installed the heating and air conditioning duct work for the project. Shortly after the system began operating, defects in the installation of the duct work were discovered. Plaintiff Lone Star Refrigeration, Inc. undertook efforts to minimize the damage to repair and replace the defective installation. Defendant BSI was made aware of the defective installation and apprised of the situation. Despite repeated de-

mands for payment for the additional work to remedy the problem and fix the damage, BSI has refused to tender payment. The manufacturer claimed that the problem was defective installation.

... After the initial discovery of the problem, the home owner began to notice a similar problem regarding the air conditioning system above the ballroom of the home. Unfortunately, further investigation has revealed the same problem that existed in other parts of the home. To date, despite demand, the Defendant has refused to pay for the estimated costs of the repairs to fix the defective heating and air conditioning duct work above the ballroom.

. . . .

Plaintiff Lone Star and Defendant BSI entered into a contract wherein BSI was to design and install proper and effective heating and air conditioning system duct work. [ ] BSI failed to perform under the contract and as such Plaintiff Lone Star has sustained damages.

. . .

Defendant BSI provided a one year warranty for all materials, equipment and labor furnished by BSI to be free from faulty, defective, or improper workmanship. This claim arose during the one year period. Despite demand under the warranty, BSI totally failed and refused to remedy and fix the problem and to reimburse Plaintiff Lone Star for expenses incurred in repairing the defective work.

. . .

Defendant made representations to Plaintiff regarding the proper design and installation of the air conditioning duct work. Plaintiff relied upon those representations and those representations turned out to be false. As a result of those false representations, Plaintiff

has sustained damages in excess of the minimal jurisdiction of law.

(Docket Entry No. 9, Ex. C at 2–4).

 The petition does not state that Building Specialties *intentionally* or *negligently* designed or installed the duct work in a defective manner. The petition does state that the duct work was defectively designed and installed. The petition also states that Building Specialties breached its contract and warranty for the duct work and made unspecified negligent misrepresentations "regarding" the design and installation. When an underlying petition does not include allegations clearly showing that the case is within or without coverage, the insurer is obligated to defend if there is potentially a case within the policy coverage. *See Trinity Universal Ins. Co. v. Employers Mut. Cas. Co.,* 592 F.3d 687, 693 (5th Cir.2010). The absence of a specific allegation of "negligence" does not show that there is no duty to defend, as a matter of law. *Cf. Stumph v. Dallas Fire Ins. Co.,* 34 S.W.3d 722, 729 (Tex.App.-Austin 2000, no pet.) ("Although the petition does not include the word 'accident,' it does not preclude the possibility that an accident caused the damage. . . ."). Nor does the record establish the absence of a duty to indemnify. The resolution of the underlying case did not show that the defective installation was not an "accident" constituting an "occurrence."

Both parties' cross-motions for summary judgment on the basis that the losses arising from the underlying lawsuit are, or are not, a covered "occurrence," are denied.

### 2. *"Property Damage"*

 "Property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property ... [or][l]oss of use of tangible property that is not physically injured." (Docket Entry No. 9, Ex. A § V, ¶ 17). In

Lamar Homes, after concluding that the underlying complaint alleged an "occurrence" because it asserted that the defective foundation resulted from the homebuilder's negligence, the Texas Supreme Court considered whether allegedly defective construction or faulty workmanship that damaged only the insured's work was "property damage" covered under the policy. 242 S.W.3d at 9–10. The court held that the allegations that the defective foundation resulted in cracks in the house's sheetrock and stone veneer were allegations of "physical injury" to "tangible property." *Id.* at 10. "Property damage" did not depend on whether the underlying claim was in tort or contract or on who owned the property that was physically injured. *Id.* at 12–15.

In *Lamar Homes*, the allegations in the underlying suit were that the homebuilder's design and construction of the foundation caused other damage—cracking in the sheetrock and stone veneer of the house. *Id.* at 10. The *Lamar Homes* court did not discuss whether the defective foundation design or construction could be "property damage" without allegations that the defective foundation caused damage to other parts of the home.

In this case, the underlying petition only alleged defective installation of the insulation duct work. (Docket Entry No. 9, Ex. C). The only damages alleged and sought were "for payment for the additional work to remedy the problem and fix the damage." (*Id.* ¶ 5). Lone Star alleged that Building Specialties "refused to pay for the estimated costs of the repairs to fix the defective heating and air conditioning duct work above the ballroom," (*id.* ¶ 6); that Building Specialties "failed to perform under the contract," (*id.* ¶ 8); and that Building Specialties "totally failed and refused to remedy and fix the problem and to reimburse Plaintiff Lone Star for expenses incurred in repairing the defective work,"

(*id.* ¶ 10). Lone Star demanded $215,000 but less than $450,000, claiming that the "repairs [were] not yet completed so the extent of the Plaintiff's damages [was] not yet certain." (*Id.* ¶ 12). Lone Star's amended petition in the underlying suit did not allege that the allegedly defective heating and air conditioning duct work damaged any other part of the home or resulted in any loss of use. To the contrary, Lone Star's petition alleged that the only damages were the "the estimated costs of the repairs to fix the defective heating and air conditioning duct work" and the "expenses incurred in repairing the defective work." (*Id.* ¶¶ 6, 10).

As part of its summary judgment response, Building Specialties submitted an affidavit from its president, John Juzswik. In the affidavit, Juzswik stated that Lone Star had "asserted that water or condensate is leaking through the diffusers (grills) and damaging an expensive hardwood floor." (Docket Entry No. 10–7, Affidavit of John Juzswik at 1). Under Texas law, this evidence cannot be considered in determining whether Liberty Mutual had a duty to defend in the underlying case. In *Pine Oak Builders, Inc. v. Great American Lloyds Insurance Co.*, 279 S.W.3d 650, 653 (Tex.2009), the Texas Supreme Court considered "whether evidence extrinsic to the eight corners of the policy and the underlying lawsuit may be used to establish the insurer's duty to defend." In the underlying litigation in *Pine Oak Builders*, the plaintiffs in five separate suits alleged water damage arising out of improper installation of a synthetic stucco or improper design and construction of columns and a balcony. *Id.* at 652. The insured's policy contained a "your work" exclusion and a subcontractor exception to the exclusion. *Id.* at 653. In four of the underlying suits, the plaintiffs alleged defective work by subcontractors,

but in one suit, there were no allegations of defective work by a subcontractor. *Id.* In the coverage suit, the insured introduced evidence that the defective work was performed by a subcontractor. *Id.* at 654. The court held that under the eight-corners rule, extrinsic evidence that the faulty workmanship was performed by a subcontractor could not establish the duty to defend. *Id.* at 655. The evidence of a subcontractor's involvement contradicted the facts alleged in the underlying suit. *Id.* at 654. The court emphasized that in deciding whether an insurer has a duty to defend, extrinsic evidence different from the allegations in the underlying pleading cannot be considered. "The policy imposes no duty to defend a claim that might have been alleged but was not, or a claim that more closely tracks the true factual circumstances surrounding the third-party claimant's injuries but which, for whatever reason, has not been asserted. To hold otherwise would impose a duty on the insurer that is not found in the language of the policy." *Id.* at 655–56.

The affidavit Building Specialties submitted in this coverage suit stated that the defective air conditioning duct work was leaking and damaging an expensive hardwood floor. But the petition in the underlying litigation did not refer to any damage to a hardwood floor or seek any damages for the cost of repairing or replacing the floor. The only allegation was of defective duct work and the only damages sought were the costs of repairing and replacing that duct work. As in *Pine Oak Builders,* the extrinsic evidence submitted in the coverage suit contradicts the claims and allegations in the underlying suit. Although Lone Star might have included in that suit damages for the hardwood flooring if it was in fact damaged to a point of needing repair or replacement, "[t]he policy imposes no duty to defend a claim that might have been alleged but was not, or a claim that more closely tracks the true

factual circumstances surrounding [Lone Star's] injuries but which, for whatever reason, has not been asserted." *See id.* Building Specialties cannot rely on this extrinsic evidence to show Liberty Mutual's duty to defend.

Limiting the analysis to the operative petition in the underlying lawsuit and the Policy language raises the question that the Texas Supreme Court did not specifically resolve in *Lamar Homes.* The petition in the underlying lawsuit did not seek any damages for the costs of repairing or replacing anything other than the duct work Building Specialties installed. The cost of tearing down, then replacing, the ceiling was part of the cost of repairing the duct work. *Lamar Homes* did not directly address whether allegations of the insured's faulty installation work and damages to repair only that work (with no damage to or damages for repairing other property alleged) could be "property damage." But in *Lamar Homes,* the Texas Supreme Court did identify a limit on "property damage" relevant to this case. The court stated:

> Some basis exists, however, for the district court's assumption that CGL insurance is not for the repair or replacement of the insured's defective work. The assumption proves true in many cases because several acts of faulty workmanship do not fall within coverage, either because they are not an "occurrence," "accident," or "property damage," or they are excluded from coverage by specific exclusions. For example, faulty workmanship that is intentional from the viewpoint of the insured is not an "accident" or "occurrence," and faulty workmanship that merely diminishes the value of the home *without causing physical injury or loss of use* does not involve "property damage."

242 S.W.3d at 10 (emphasis added); *see also Admiral Ins. Co. v. Little Big Inch Pipeline Co.,* 523 F.Supp.2d 524, 538 (W.D.Tex.2007) (citing *Lamar Homes* and noting that Texas law does not recognize purely economic damages as "property damage"); *Charlton v. Evanston Ins. Co.,* 502 F.Supp.2d 553, 560 (W.D.Tex.2007) ("[I]f the factual allegations read as a contractual breach for construction defects requiring repair or replacement instead of negligence resulting in property damage, the resulting damage for economic loss does not fall within the coverage of the insurance policy."); *Fritz Indus., Inc. v. Wausau Underwriters Ins. Co.,* No. Civ. A. 3:02–CV–894–L, 2004 WL 396258, at *5 (N.D.Tex. Jan. 26, 2004) (holding that damages sought in an underlying lawsuit for labor and material costs to replace the insured's allegedly defective floor tile, among other damages sought, was not a claim for "property damage"); *Jennings v. State Farm Lloyds,* No. 03–04–00477–CV, 2006 WL 66408, at *6 (Tex.App.-Austin Jan. 12, 2006, no pet.) (mem. op., not designated for publication) (holding that allegations that work to a home was not done in a workmanlike manner was not an allegation of "property damage"). *See generally* 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES & INSUREDS § 11:1 (5th ed. Supp. 2010) ("[I]f if there has not been *my property damage* or *bodily injury,* but only costs incurred to prevent future damage/injury, there should not be coverage."); *id.* ("[T]he installation/incorporation of a defective product into a larger product can constitute property damage to the larger product. It has, however, been held that the mere incorporation of an insured's defective work/product into a larger product does not constitute property damage if the defective work/product did not cause physical damage to the larger product; that is, if the alleged harm is limited to the cost of replacing the insured's defective work/product." (footnote omitted)).

Liberty Mutual cites *Lennar Corp. v. Great American Insurance Co.,* 200 S.W.3d 651 (Tex.App.-Houston [14th Dist.] 2006, pet. denied), to support its argument that defective installation by itself does not constitute "property damage." In *Lennar Corp.,* the court considered whether a homebuilder's claims arising out of the use of an allegedly defective exterior insulation and finish system were covered "property damage." The court distinguished among three categories of damages: (1) the cost to repair water damage that occurred as a result of the insulation defect; (2) the cost to remove and replace the defective insulation; and (3) the cost for overhead, inspection, personnel, and attorneys' fees. *Id.* at 677. The court concluded that the first category, which included damages for wood rot, was "property damage" because it was physical injury to tangible property. *Id.* The court held that the cost to remove and replace the defective insulation on all homes as a way to prevent future damage to those homes was not property damage. *Id.* at 678–79. Finally, the court held that the third category of costs was not "property damage" that the homebuilder was "legally obligated to pay." *Id.* at 680–81.

Building Specialties argues that *Lennar Corp.* no longer applies in light of *Lamar Homes.* But the holding in *Lamar Homes*—that physical injury to tangible property that is the insured's work *can* be "property damage"—does not mean that claims arising out of the insured's work *are* "property damage" in every case. To the contrary, the *Lennar Corp.* court distinguished between allegations that the insured's work caused physical injury to property—which could be to the insured's own work—and allegations that the insured's work was defective but had not resulted in physical injury to property.

The *Lamar Homes* court recognized that "faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage.' " 242 S.W.3d at 10.

Building Specialties relies on three additional cases to support its argument that Lone Star alleged "property damage": *Home Owners Management Enterprises, Inc. v. Mid–Continent Casualty Co.,* 294 Fed.Appx. 814 (5th Cir.2008); *Rotella v. Mid–Continent Casualty Co.,* No. 3:08–CV–0486–G, 2008 WL 2694754 (N.D.Tex. July 10, 2008), and *Pine Oak Builders, Inc. v. Great American Lloyds Insurance Co.,* 279 S.W.3d 650 (Tex.2009). In each of those cases, as in *Lamar Homes,* the plaintiffs in the underlying litigation alleged some kind of property damage apart from the allegedly defective work of the insured. *See Home Owners Mgmt. Enters.,* 294 Fed.Appx. at 815 (observing that the underlying plaintiffs alleged "structural and cosmetic damages that resulted from construction defects"); *Rotella,* No. 3:08–CV–0486–G, 2008 WL 2694754 at *1 n. 2 (noting that the alleged defects "included a major structural defect existing in the wall in the den causing deflections in the flooring, and damages resulting from the negligence of the plaintiffs and their subcontractors in construction"); *Pine Oak Builders, Inc.,* 279 S.W.3d at 651 (stating that the allegations in the underlying suit were for water damage due to improper installation of synthetic stucco or improper design and construction of columns and a balcony). These cases do not support the argument Building Specialties advances.

Building Specialties also relies on *National Union Fire Insurance Co. of Pittsburgh, Pennsylvania v. Puget Plastics Corp.,* 532 F.3d 398 (5th Cir.2008). In *Puget Plastics,* the insured manufactured water chambers that were incorporated into tankless water heaters. *Id.* at 400. The insured "knowingly flouted" the temperature guidelines for the plastic used to manufacture the water chambers. *Id.* Many of the chambers ruptured, damaging the water heaters and sometimes damaging customers' homes and businesses. *Id.* The water-heater manufacturer sued the chambers manufacturer, alleging deceptive trade practices. A jury awarded the water-heater manufacturer damages for lost profits, diminution in the company's value due to reputation damage, and the cost of repairing and replacing the damaged water heaters. *Id.*

The chambers manufacturer's commercial umbrella insurer refused to participate in postjudgment mediation. The manufacturer and its primary insurer eventually settled. The umbrella insurer sought a declaratory judgment that it was not liable for the settlement, and the manufacturer counterclaimed for a declaratory judgment that the settlement amount was covered. *Id.* at 401. The district court denied the insurer's motion for summary judgment and granted in part the manufacturer's motion. *Id.* The insurer was granted an interlocutory appeal and argued that the jury's findings precluded coverage. *Id.*

On appeal, the Fifth Circuit held that the jury's finding that the chambers manufacturer had "knowingly" violated the Texas Deceptive Trade Practices Act did not equate to a finding that the underlying actions were not an "accident" that could be a covered "occurrence." *Id.* at 402. The appellate court held that the chambers manufacturer had created a fact issue about whether it expected the chambers to rupture or whether the ruptures were highly probable. The manufacturer had submitted evidence that it had made adjustments it believed would reinforce the chambers. *Id.*

The insurer argued that the policy did not cover the damages awarded for the water-heater manufacturer's lost profits or diminution in that company's value due to its damaged reputation. *Id.* at 403. In addressing that argument, the appellate court observed that while the jury in the underlying case had awarded damages for the costs of repairing and replacing the water chambers in the heaters, "the district court properly found that [the chambers manufacturer] cannot recover these damages because they fall under the Policy's impaired property exclusion." *Id.* n. 8. In discussing that exclusion, the appellate court observed that the policy did "not cover: (1) damage to the Puget-manufactured water chambers and (2) damage to Microtherm's water heaters that can be fixed by repairing or replacing the Puget-manufactured water chambers." *Id.* The appellate court held that the insurer had failed to meet its burden to establish that the impaired property exclusion applied. *Id.* at 404.

After the interlocutory appeal, the *Puget Plastics* district court continued with the bench trial. In the resulting opinion, the district court addressed whether the allegations of damage to the water chambers were allegations of covered "property damage." *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Puget Plastics Corp.*, 649 F.Supp.2d 613, 646 (S.D.Tex.2009). That part of the opinion appears to deal only with water chambers that had cracked. The opinion distinguished among water chambers that had to be replaced but did not damage the water heaters or other property; water chambers that had to be replaced and were damaged (those that melted) but did not damage the water heaters or other property; and water chambers that did cause damage to other parts of the water heaters or the customers' homes or businesses. The court noted that the Fifth Circuit had affirmed its holding that pursuant to the

policy's business-risk exclusion, the chambers manufacturer could not "recover for the damages awarded to [ the water-heater manufacturer] for the costs of repairing and replacing the plastic water chambers." *Id.* at 650 n. 70. The district court ultimately held that there was no reasonable, nonarbitrary basis to allocate damages between covered and uncovered risks. *Id.* at 652. Because the court held that the insured had the burden to allocate the judgment between covered and uncovered claims under Texas law, the insured's failure to show which damages were due to the cost of replacing undamaged water chambers was fatal to its claim for coverage. *Id.* at 649–650, 652. The court held that the insurance company had neither a duty to defend nor to indemnify the chambers manufacturer. *Id.* at 656–57.

Building Specialties appears to argue that the Fifth Circuit's opinion in *Puget Plastics* stands for the proposition that repair or replacement of the insured's allegedly defective work must be "property damage" because the court would not have discussed whether an exclusion applied without first concluding that there was covered "property damage." The *Puget Plastics* analysis does not support this argument. In *Puget Plastics*, the design defect in the water chambers caused physical injury to some of the water chambers themselves; they melted. Other water chambers were not damaged but were replaced. The district court's first opinion in *Puget Plastics* did not discuss whether the cost of replacing undamaged water chambers was covered "property damage" because the "impaired property" exclusion— an exclusion not at issue in this case— "clearly" applied. *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 450 F.Supp.2d 682, 696 (S.D.Tex.2006), *aff'd*, 532 F.3d 398 (5th Cir.2008). The policy at issue in *Puget Plastics* required an "occurrence," which was defined as "an accident, including con-

tinuous or repeated exposure to conditions, which results in Bodily Injury or Property Damage." *Id.* at 688 (emphasis omitted). The court considered separately whether there was an "accident" and whether there was "property damage."

The court discussed the damaged water chambers but declined to decide whether the damage was an "accident" because it held that the "your product" exclusion applied to preclude coverage for "damages to the chambers themselves." *Id.* at 696–97. The court did not address the undamaged water chambers in analyzing whether there was an "accident." In summarizing its holding, the court stated that "[d]amage to the water chambers themselves is excluded by the policy and therefore will not suffice as proof of property damage." *Id.* at 704. The district court also held that the "impaired property" exclusion applied to preclude coverage for water heaters that were not damaged and were put back into service once the defective water chambers were replaced. *Id.* at 701–02. In summarizing that portion of the holding, the court noted that damage to businesses and homes would constitute damage "as opposed to those water heaters which may fall into the category of 'impaired property.'" *Id.* at 704. *Puget Plastics* does not support Building Specialties' argument because the court relied on an exclusion not at issue in this case and did not decide whether there were allegations of "undamaged" water chambers or whether the costs of removing undamaged water chambers were covered "property damage."

In this case, as discussed above, the amended petition in the underlying litigation alleged only that the duct work was defective and had to be replaced. There were no allegations of any resulting physical damage to the duct work itself or to other parts of the house or to the loss of use. The petition sought damages only for the cost of repairing the defective duct work. The petition alleged defective work by the insured but did not allege that the defective work "caused physical injury or loss of use." The petition did not allege covered "property damage." *See generally* 3 ALLAN D. WINDT, INSURANCE CLAIMS & DISPUTES: REPRESENTATION OF INSURANCE COMPANIES & INSUREDS § 11:1 (5th ed. 2010) ("[I]t is not enough that the party suing the insured has incurred property damage; the damages being sought must be because of that property damage. And the issue is not whether the insured could be sued for such damages, but whether it *is* being sued for such damages." (footnote omitted)).[1] As a matter of law, there is no duty to defend because the underlying lawsuit did not claim covered property damage.[2]

 Although the duty to defend is broader than the duty to indemnify, the duty to indemnify is distinct from the duty to defend and can exist even when the duty to defend never arises. *D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 743–44 (Tex.2009). Liberty Mutual could have a duty to indemnify even without a duty to defend. In determining the duty to indemnify, evidence

---

**1.** This result is not based on the economic-loss rule rejected as a rule for "property damage" in *Lamar Homes*. That rule precludes a tort recovery for economic loss arising out of a breach of contract. *Lamar Homes*, 242 S.W.3d at 12. The distinction in this case is made not between tort and contract damages but rather on the basis of whether there has been "physical damage" to "tangible property," regardless of the underlying theories of liability or ownership of the property.

**2.** If there had been allegations or evidence of covered property damage, the "your work" exclusion, discussed below, would preclude coverage for damages for the faulty duct work itself, even if coverage might be available for property damage to other parts of the project.

beyond the underlying petition and the insurance policy may be considered. The affidavit of the Building Specialties president is relevant to showing the duty to indemnify. The affidavit states, "[The owner] and Lone Star have asserted that water or condensate is leaking through the diffusers (grills) and damaging an expansive hardwood floor." (Docket Entry No. 14, Ex. 1, Affidavit of John Juzswik at 1). Liberty Mutual alleges that this statement is inadmissible hearsay. (Docket Entry No. 15 at 7). Building Specialties did not respond to this objection.

■ "Hearsay" is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c). The statement in the affidavit that the homeowner and Lone Star told Juzswik that the floors in the house were damaged is offered to show that hardwood floors in the house were damaged because of leaks or condensation caused by the duct work. This statement is hearsay and inadmissible unless it falls within a hearsay exception or exclusion. Building Specialties has the burden to show by a preponderance of the evidence that the evidence falls within an exclusion or exception to the rule. *See Sowders v. TIC United Corp.*, No. SA–05–CA–309–OG, 2007 WL 3171797, at *1 (W.D.Tex. Aug. 15, 2007). Building Specialties has not pointed to an applicable hearsay exception or exclusion, nor is one evident from the record. The statement is not competent summary judgment evidence. Without the statement, the record does not provide evidence of "property damage" that shows that Liberty Mutual had a duty to indemnify Building Specialties. Liberty Mutual's motion for summary judgment on the ground that there is no "property damage" is granted.

Liberty Mutual's alternative grounds for summary judgment, the "your product" and "your work" exclusions, are discussed below.

## B. Exclusion K

■ Exclusion K applies to "[p]roperty damage to 'your product' arising out of it or any part of it." (Docket Entry No. 9, Ex. A § I(2)(k)). "Your product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled, distribute or disposed of by ... You." (*Id.* § V, ¶ 21). "Your product" includes "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" (*Id.*).

Liberty Mutual argues that the duct work was a Building Specialties product and that Exclusion K bars coverage for "property damage" to the duct work itself. (Docket Entry No. 9 at 14). Building Specialties responds that Exclusion K does not apply to a building or its components, citing *Mid–United Contractors, Inc. v. Providence Lloyds Insurance Co.*, 754 S.W.2d 824, 826 (Tex.App.-Fort Worth 1988, writ denied), and *CU Lloyd's of Texas v. Main Street Homes, Inc.*, 79 S.W.3d 687, 697 (Tex.App.-Austin 2002, no pet.). Liberty Mutual in turn argues that these cases are distinguishable because Building Specialties did not construct the building but only installed the duct work. (Docket Entry No. 9 at 20).

The live pleading in the underlying litigation when Building Specialties settled with Lone Star alleged that the duct work "installation" was defective. (Docket Entry No. 1, Ex. B). The allegations of a defective product were dropped after Knauf settled. Exclusion K nonetheless applies to the Building Specialties work because the insulation it installed was a "good [ ] or product" that Building Specialties "handled" or "sold." The cases Building Specialties cites, *Mid–United Contrac-*

*tors, Inc.* and *CU Lloyd's of Texas,* deal with damages claimed for property damage to buildings. In *Mid–United Contractors,* the court held that a similar but not identical products exclusion did not apply to the construction of a building because buildings—unlike products—are built, constructed, or erected, not manufactured. 754 S.W.2d at 826. The *CU Lloyd's of Texas* court agreed with that analysis and held that a completed house was not a "product." 79 S.W.3d at 697. The insulation ducts that Building Specialties installed are more similar to components that are manufactured and later installed into a house or building than to the complete buildings that were "built, constructed, or erected" at issue in *Mid–United Contractors* or *CU Lloyd's of Texas. See Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.,* 359 F.3d 770, 776 (5th Cir.2004) (holding that steel flanges made for use in the construction of microwave towers were the insured's "product" and that the "your product" exclusion applied to preclude coverage for damage to the flanges); *Dal–Tile Corp. v. Zurich Am. Ins. Co.,* No. Civ. A. 3:02–CV–0751–K, 2004 WL 414900, at *5 (N.D.Tex. Feb. 2, 2004) (holding that floor tiles and flooring materials used in the construction of a shopping mall were the insured's product and that the "your product" exclusion precluded coverage for damages for the repair or replacement of the tiles); *Fritz Indus., Inc. v. Wausau Underwriters Ins. Co.,* No. Civ. A. 3:02–CV–894–L, 2004 WL 396258, at *5 (N.D.Tex. Jan. 26, 2004) (holding that coverage for damages incurred to replace the insured's allegedly defective tile installed in a racetrack was precluded by the "your product" exclusion); *Zurich Am. Ins. Co. v. Nokia, Inc.,* 268 S.W.3d 487, 500 (Tex. 2008) (citing with approval cases holding that the business-risk exclusions in commercial general liability policies are intended to preclude coverage for the re-placement or repair of the insured's faulty products).

To the extent Building Specialties claims a duty to defend or indemnify arising out of "property damage" to the faulty product—the cost of remedying the defective insulation—that claim is precluded by the "your product" exclusion as a matter of law. To the extent that Building Specialties claims a duty to defend or indemnify arising out of "property damage" from the defective installation of the product, Exclusion L also applies.

#### C. Exclusion L

■ Exclusion L provides, in pertinent part, that the Policy does not cover "[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" (Docket Entry No. 9, Ex. A § 1, ¶ 2(*l*)). "Products-completed operations hazard" is defined, in relevant part, as "'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work' except ... [w]ork that has not yet been completed or abandoned." (*Id.,* Ex. A § V, ¶ 16). Exclusion L has an exception for work "performed on [the insured's] behalf by a subcontractor." (*Id.,* Ex. A § I, ¶ 2(*l*)).

Following *Lamar Homes,* the Fifth Circuit considered the application of an exclusion identical to the "your work" exclusion in the Liberty Mutual Policy. In *Wilshire Insurance Co. v. RJT Construction, LLC,* 581 F.3d 222, 226 (5th Cir.2009), the court held that the exclusion precludes coverage for the cost of repairing the insured's own work. In the underlying litigation in *Wilshire Insurance,* the plaintiff alleged that the insured negligently repaired the house's foundation, causing cracks in the walls and ceilings. *Id.* at 224. The court held that the "your work" exclusion applied to preclude coverage for the cost of

repairing and replacing the insured's foundation but did not exclude coverage for damage to other property as a result of the defective work. *Id.* at 226; *see also Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 655 (Tex. 2009) ("[C]laims of faulty workmanship by [the insured] are excluded from coverage under the 'your work' exclusion.").

Unlike the allegations in the underlying litigation in *Wilshire Insurance Co.*, Lone Star alleged damages only for repairing and replacing Building Specialties' allegedly defective duct work. The only allegations in the amended petition in the underlying lawsuit are of defective duct work by Building Specialties that had to be repaired or replaced. There is no allegation or competent summary judgment evidence of damage to any other property resulting from the defective duct work. The "your work" exclusion applies to all Lone Star's claims, instead of just a portion of the claims as in *Wilshire Insurance Co.*

Building Specialties argues that the subcontractor exception to Exclusion L applies. Exclusion L states that it does not apply to work "performed on [the insured's] behalf by a subcontractor." (Docket Entry No. 9, Ex. A § I, ¶ 2(*l*)). "Subcontractor" is not defined in the Policy. In his affidavit, John Juzswik, the Building Specialties president, stated that "almost all of the actual fabrication and installation of the insulation material was performed by laborers employed by Marek Employment Management Company ("Memco")." (Docket Entry No. 14, Ex. 1, Affidavit of John Juzswik at 2). Juzswik stated that "Memco is an entity unrelated to BSI and is an independent contractor of BSI." (*Id.*). Juzswik also stated that BSI employees were trained by Knauf in fabricating and installing the Kool–Duct insulation and that Knauf inspectors were at the residence to inspect the work. (*Id.*).

The live pleading in the underlying litigation contained no allegations about, or mention of, a subcontractor. Under *Pine Oak Builders*, the exception to the "your work" exclusion is inapplicable as a matter of law, and Liberty Mutual had no duty to defend Building Specialties in the underlying litigation, regardless of whether the faulty workmanship was in fact due to the work of a subcontractor.

■ *Pine Oak Builders* is not dispositive of Liberty Mutual's duty to indemnify. *See D.R. Horton–Tex., Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 741 (Tex.2009). Building Specialties invokes the subcontractor work exception to the "your work" exclusion for the duty to indemnify based on the affidavit evidence that the allegedly faulty work was performed by a subcontractor. Liberty Mutual argues that the Juzswik affidavit is insufficient to create a fact issue whether Memco or Knauf were subcontractors because the statement that Memco was a "independent contractor" is conclusory and is not evidence that Memco was a "subcontractor." Liberty Mutual argues that the ordinary and generally accepted meaning of "subcontractor" requires evidence that Memco or Knauf assumed responsibility for performing part of the Building Specialties contract with Lone Star. (Docket Entry No. 15 at 8–14).

■ Undefined terms in an insurance policy are given their commonly understood or generally accepted meaning. *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 8 (Tex.2007). "Subcontractor" has been defined as "[o]ne who is awarded a portion of an existing contract by a contractor," BLACK'S LAW DICTIONARY 1464 (8th ed. 2004); "a person who has furnished labor or materials to fulfill an obligation to an original contractor or to a subcontractor to perform all or part of the work required by an original contract," TEX. PROP.CODE § 53.001 (definition appli-

cable to mechanic's, contractor's, or materialman's liens); "an individual or business firm contracting to perform part or all of another's contract," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1173 (1990); "one who takes a portion of a contract from the principal contractor or another subcontractor," *Avondale Indus., Inc. v. Int'l Marine Carriers, Inc.,* 15 F.3d 489, 494 (5th Cir. 1994) (citing *Hardware Mut. Cas. Co. v. Hilderbrandt,* 119 F.2d 291 (10th Cir. 1941)); and "a person or company that assumes by secondary contract some or all of the obligations of the original contractor," *Nautilus Ins. Co. v. ACM Contractors, Inc.,* 549 F.Supp.2d 857, 866 (S.D.Tex. 2008) (quoting WEBSTER'S NEW WORLD DICTIONARY 1333 (3d ed. 1998)).

Liberty Mutual cites *Avondale Industries, Inc. v. International Marine Carriers, Inc.,* 15 F.3d 489 (5th Cir.1994). In *Avondale,* the Fifth Circuit interpreted a provision requiring a contractor to indemnify other parties for damages caused by the negligence of its subcontractors. *Id.* at 494. In considering whether the damages were caused by a subcontractor, the Fifth Circuit defined subcontractor as "one who takes a portion of a contract from the principal contractor or another subcontractor." *Id.* (citing *Hilderbrandt,* 119 F.2d 291). The lower court had analyzed whether the entity at issue was an "independent contractor." *Id.* The Fifth Circuit held that the lower court's discussion of "independent contractor" was irrelevant to the analysis of whether the actor was a "subcontractor." *Id.* The court noted that a "subcontractor" and an "independent contractor" are not mutually exclusive terms. The court found subcontractor status because the entity at issue had contracted to perform duties that the original party was obligated to perform under the contract. *Id. Avondale Industries* did not address the definition of "subcontractor" in Texas commercial general liability policies. *Avondale Industries* did not address Tex-

as law. And, as the court in *Avondale* noted, a party might be both an independent contractor and a subcontractor. *Id.* The inquiry is properly focused on the summary judgment evidence about the work that Memco and Knauf did at the house where Building Specialties was working to install the insulation duct work, not on the use of the term "independent contractor."

The statement in the Juzswik affidavit that Memco furnished the laborers who did "almost all of the actual fabrication and installation of the insulation material" raises a fact issue as to whether Memo "furnished labor or materials to fulfill an obligation to an original contractor," TEX. PROP. CODE § 53.001 (definition applicable to mechanic's, contractor's, or materialman's liens), or "contract[ed] to perform part or all of another's contract," WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1173 (1990). Under Texas law, "a materialman or supplier can be, and often is, considered a subcontractor under the general usage of the term." *Nautilus Ins. Co. v. ACM Contractors, Inc.,* 549 F.Supp.2d 857, 867 (S.D.Tex.2008) (citing *Crow–Williams, I v. Fed. Pac. Elec. Co.,* 683 S.W.2d 523, 525 (Tex.App.-Dallas 1984, no writ)). In *Nautilus Insurance,* the insured had a contract with a county to construct a bridge and arranged to have a concrete company provide concrete for the project. *Id.* The concrete company provided the cement truck and a driver who operated the truck while the cement was being poured. *Id.* While pouring the concrete, the driver was electrocuted and died. The contractor's insurer sought a declaratory judgment that it did not owe a duty to defend or indemnify the contractor under a policy excluding coverage for subcontractors. *Id.* at 861–62. The term "subcontractor" was not defined in the policy. *Id.* at 860 n. 15. The court held that "subcontractor" was to be given its ordinary meaning as "an indi-

vidual or business firm contracting to perform part or all of another's contract" or "one who takes a portion of a contract from a principal contractor or another subcontractor." *Id.* at 867. The court held that there was "nothing in the [contractor and concrete company's] interaction that is atypical of the relationship between a contractor and subcontractor working on a construction project." *Id.* The court observed:

> [The] argument that Original Concrete provided nothing in furtherance of [the insured's] contract with Harris County is absurd. The court can see no other purpose for which Original Concrete might have been called to the construction site. Original Concrete provided and poured the concrete [the insured] needed to further the construction of the bridge. Moreover, even if Original Concrete was characterized as only a part of the delivery process, *Crow–Williams* indicates that materialmen and suppliers are also subcontractors.

*Id.* (citing *Crow–Williams*, 683 S.W.2d at 525).

Building Specialties has provided summary judgment evidence that "almost all of the actual fabrication and installation of the insulation materials was performed by laborers employed by Marek Employment Management Company ("Memco")." (Docket Entry No. 14, Ex. 1, Affidavit of John Juzswik at 2). The evidence that Memco provided labor in furtherance of the Building Specialties contract with Lone Star is similar to the allegations in *Nautilus* that the concrete company was working on the construction site in furtherance of the insured contractor's obligations under the construction contract. The record does not permit this court to find as a matter of law that Memco was, or was not, a subcontractor under the exception to Exclusion L.

Liberty Mutual also argues that Knauf is, as a matter of law, not a "subcontractor." Courts holding a supplier of building materials a "subcontractor" for the purposes of the "your work" exception typically do so on the basis of custom fabrication combined with an on-site presence. *See Limbach Co. LLC v. Zurich Am. Ins. Co.*, 396 F.3d 358, 364–65 (4th Cir.2005) (holding that a pipe manufacturer was a subcontractor for the purpose of a "your work" exclusion when the pipe company custom manufactured the pipe and provided on-site installation instructions); *Nat'l Union Fire Ins. Co. of Pittsburgh, Penn. v. Structural Sys. Tech., Inc.*, 964 F.2d 759, 763 (8th Cir.1992) (holding that a supplier of "specially designed steel rods" was a subcontractor and holding that the exception to the "your work" exclusion applied); *see also Wanzek Constr., Inc. v. Employers Ins. of Wausau*, 679 N.W.2d 322, 329 (Minn.2004) (holding that custom fabrication and on-site services met the definition of "subcontractor" in a "your work" exclusion). Building Specialties provided summary judgment evidence that Knauf supplied the insulation material and also trained Building Specialties' employees in installation and made some site visits to inspect the installation. There are, however, no allegations or evidence that Knauf's Kool–Duct insulation was custom made for this installation. The evidence as to Knauf's role is limited; it provided some training to Building Specialties' employees on how to do the installation—which Juzswik states these employees did not do because Memco employees did the work—and some on-site inspection of the work that was performed. *Cf. Collett v. Ins. Co. of the W.*, 64 Cal.App.4th 338, 75 Cal.Rptr.2d 165 (1998) (holding that an inspector the insured hired was not a "subcontractor" because "[w]hile the inspector may have failed to catch defects in the retaining

walls, he did not put them there[, the insured] did"). However, *Nautilus Insurance* and a case it cites, *Crow–Williams, I v. Federal Pacific Elec. Co.*, 683 S.W.2d 523 (Tex.App.–Dallas 1984, no writ), indicate that a materialman may fit in the generally accepted meaning of "subcontractor" in the context of insurance policies. The record is inadequate to permit this court to find that Knauf is, or is not, a subcontractor as a matter of law.

Finally, to the extent that Building Specialties argues that the definition of "products-completed operations hazard" creates additional coverage negating the application of the "your work" exclusion, (Docket Entry No. 17), that argument is foreclosed by *Valmont Energy Steel, Inc. v. Commercial Union Insurance Co.*, 359 F.3d 770 (5th Cir.2004). In *Valmont Energy Steel, Inc.*, the Fifth Circuit explicitly rejected the argument that the definition of "products-completed operations hazard" creates any additional coverage. *Id.* at 776. Although *Valmont Energy Steel, Inc.* dealt with the definition in reference to the "your product" exclusion and an aggregate limit on products-completed operations, the holding applies to the "your work" exclusion as well. The "your work" exclusion provides that the insurance does not apply to " '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' " (Docket Entry No. 9, Ex. A § I, ¶ 2(*l*)).

In sum, the subcontractor exception to the "your work" exclusion might apply as to Liberty Mutual's duty to indemnify, though not its duty to defend, as discussed above. However, there is no coverage as a matter of law because the occurrence did not cause "property damage" as that term is defined in the Liberty Mutual Policy and because of the application of the exclusions discussed above.

## IV. Conclusion

Liberty Mutual's motion for summary judgment is granted. The cross-motion for partial summary judgment filed by Building Specialties is denied. Judgment is entered by separate order.