Opinion issued May 12, 2011.



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00711-CV

———————————

Lexington Insurance Company, Appellant

V.

National Oilwell NOV, Inc. and


Fiberglass
Systems, L.P.,
Appellees



 



 

On Appeal from the 189th Judicial District

Harris County, Texas



Trial Court Case No. 2006-33074

 



 

O P I N I O N

          Albemarle
Corporation (Albemarle) sued National Oilwell NOV, Inc. (National) in federal
district court in Arkansas.  It sought
damages allegedly caused by defective fiberglass downhole tubing (DHT) that National
had manufactured and sold it.  National
timely notified its insurer, Lexington, of the lawsuit, and Lexington
acknowledged a responsibility to defend under a reservation of rights once
National exhausted its self-insured retention. 


After the case settled, Lexington
brought this suit in Texas state district court, seeking a declaration of the
rights and duties of the parties under the policy with respect to the Albemarle
suit.  After considering the parties’
cross-motions for summary judgment, the trial court granted relief in
National’s favor, holding that Lexington had a duty to defend National in the
Albemarle suit, accordingly awarding National its defense costs as damages and
attorney’s fees.

On appeal, Lexington contends that
the trial court should have granted its motion for summary judgment because the
allegations of damages sought in the Albemarle suit are excluded by the terms
of the Lexington policy.  Thus, it
contends, the Albemarle allegations did not trigger a duty to defend under the
policy.  Lexington alternatively contends
that it owed no duty to pay the defense costs National incurred after it
exhausted the limits of the self-insured retention clause because National
failed to timely notify Lexington it exhausted its SIR.  National further challenges the propriety of
the trial court’s corresponding summary judgment on National’s counterclaims
for breach of contract and violation of the Texas Insurance Code’s prompt
payment statute.  Tex. Ins. Code Ann. §§ 542.051–.061 (West 2009).  Finding no error, we affirm.

Background

I.       The
insurance policy

Lexington issued a
commercial general liability policy to the insureds for the policy period from
May 11, 1999 to May 11, 2002.  Pertinent
to this case, the policy contains an endorsement for products liability claims
that provides:

. . . Underwriters
will indemnify the Assured in respect of damages arising out of the Products
Liability hazard, whether imposed by law or assumed under contract in respect
of any claim which is first made in writing against the Assured during [the
policy period] and which arises solely by reason of 

. . . 

(b)     Property Damage

resulting from any
Accident. . . .

“Products Liability” shall mean:

Liability
for . . . Property Damage arising out of the Assured’s
products or reliance upon a representation or warranty made at any time with respect
thereto, but only if the . . . Property Damage happens
after physical possession of such products has been relinquished to others and
happens away from the premises owned, leased or rented by the Assured.

“Property Damage” shall mean:

physical loss of or damage to or
destruction of tangible property, including the loss of use arising directly
therefrom.

The policy, however, excludes coverage
for:

·       
Property Damage to the Assured’s Products arising out of
such products or any part of such products [or]

 

·       
The withdrawal, recall, repair, replacement or loss of use
of the Assured’s products or work completed by or for the Assured.

The policy contains a self-insured
retention of $100,000 for each occurrence. 


II.      The underlying suit

          A.      Albemarle’s allegations

According to
Albemarle’s pleadings in the Arkansas suit, its business entails extraction of
bromide ions from brine recovered from subsurface deposits.  Albemarle uses pipes to transport the brine
to its manufacturing facilities for the extraction.  After processing the brine, Albemarle
transports the heated “tail brine” through more pipes to underground storage
wells and eventually back to subsurface reservoirs.

Beginning in 1994,
National’s predecessor, A.O. Smith, sold fiberglass downhole tubing, or pipe,
to Albemarle.  Albemarle replaced its
existing metal pipe with the fiberglass DHT. 
It used the DHT to transport the brine to its manufacturing facilities
in Columbia City, Arkansas.  Finding that
the fiberglass pipe was more durable than the metal pipe, Albemarle asked Smith
to manufacture a DHT product for use in its disposal wells.  Smith recommended a pipe made with aromatic
amine epoxy, one that it already had manufactured for use in transporting
natural and manufactured gas, petroleum fuels, and mixed gases.  

Albemarle installed
the aromatic amine epoxy pipe in April 1995. 
Eventually, however, the pipe split, separated, and leaked.  These failures left Albemarle unable to
continue operations in several of its disposal wells.  By November 1995, Smith informed Albemarle
that its testing revealed that the pipe had an inadequate tensile strength for
transporting the hot tail brine.  

With respect to
damages, Albemarle first alleged that it was entitled to recover repair and
replacement costs of the pipe and lost income because it was forced to forego
business opportunities while operating without several of its disposal wells.  Second, Albemarle alleged that its injection
wells were forced to stop operations “while being repaired.”  The entire damages section reads: 

Albemarle has suffered damages
including, but not limited to, the following:

(a)     Albemarle has spent or reasonably
anticipates spending more than $2,900,600 to repair or replace the defective
DHT;

(b)     Albemarle lost income and profits due to
the fact that the injection wells containing the defective DHT were forced to
stop operations while being repaired;

(c)      Albemarle lost business opportunities due
to the fact that the injection wells containing the defective DHT were forced
to stop operations while being repaired;

(d)     Albemarle suffered other incidental and
consequential damages due to the defective condition of the DHT; and

(2)     Albemarle has incurred attorneys’ fees and
expenses in having to bring this cause of action.

To represent it in the
Albemarle suit, National retained Texas defense counsel expressly identified in
the Lexington policy as “approved counsel that may be used by the Assured without
seeking prior approval from Underwriters in the event of a Loss under this
policy.”  National also retained local
counsel in Arkansas to assist in its defense.

B.      Notice
and claims handling

Through its insurance
broker, National notified Lexington of the Albemarle suit in April 2005.  Defense counsel provided Lexington with a
December 2005 status report.  Lexington
responded by sending National a reservation of rights letter four months later,
in April 2006.  In the letter, Lexington
concluded that Albemarle’s claims fell within the policy’s products liability
endorsement, creating “a potential indemnity obligation for Lexington with
regard to the allegations . . . .”  Then,
Lexington proceeded to examine whether any of the policy exclusions barred coverage.  Lexington noted that “the cost of repair
and/or replacement of the DHT which failed in the wells is a significant
element of Albemarle’s claimed damages,” but conceded that:

it is unclear from Albemarle’s
Complaint the exact nature and extent of all the damages claimed by Albemarle
as a result of the failure of the DHT. 
Certain of the damages claimed by Albemarle, such as lost profits, lost
business opportunities, consequential losses associated with the replacement of
the DHT could conceivably not be precluded from coverage by virtue of the
exclusions cited above. . . .”

While reserving its rights, Lexington
acknowledged that it “may have a contractual duty to indemnify [National] in
this matter but only after the SIR of $100,000 has been paid by [National] in
defense and/or settlement or judgment of Albemarle’s claims.”  Lexington reiterated its agreement to
National’s selection of defense counsel for the suit and continued, “[a]t such
time as it appears likely that the SIR will be fully eroded, Lexington requests
that [National] so notify Lexington so that Lexington may then begin to provide
a defense to [National] for the claims in the complaint, and to take reasonable
steps in this matter necessary to protect [National’s] interests, as well as Lexington’s
own.”  

National incurred
$703,179.27 in attorney’s fees and expenses—well in excess of the SIR—before
settling the Albemarle case.  Lexington
declined to reimburse National for the balance exceeding the SIR and brought a
declaratory judgment action against National in May 2006.  Lexington asked the trial court to declare
that it had no duty to defend National under the policy, and alternatively,
that National’s failure to provide timely notice that it exhausted the SIR
relieved Lexington from any obligation to pay the attorney’s fees and
expenses.  National counterclaimed for
breach of contract and violation of the Texas Insurance Code’s prompt payment
provision.  Tex. Ins. Code Ann. § 542.051.  The trial court considered the parties’
cross-motions for summary judgment and granted summary judgment in favor of
National.

Discussion

I.       Standard
of review

We review a trial court’s summary
judgment de novo.  Valence Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005); Provident Life Accid. Ins. Co. v. Knott,
128 S.W.3d 211, 215 (Tex. 2003).  Under
the traditional standard for summary judgment, the movant has the burden to
show that no genuine issue of material fact exists and that the trial court
should grant a judgment as a matter of law. 
Tex. R. Civ. P. 166a(c);  KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp., 988 S.W.2d
746, 748 (Tex. 1999).  When
reviewing a summary judgment, we
take as true all evidence favorable to the nonmovant and indulge every
reasonable inference and resolve any doubts in the nonmovant’s favor.  Dorsett,
164 S.W.3d at 661; Knott, 128 S.W.3d
at 215; Sci. Spectrum, Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).  

Traditional summary judgment is proper only if the
movant establishes that there is no genuine issue of material fact and that the
movant is entitled to judgment as a matter of law.  Tex.
R. Civ. P. 166a(c). The motion must state the specific grounds relied
upon for summary judgment.  Id.  A defendant moving for traditional summary
judgment must conclusively negate at least one essential element of each of the
plaintiff’s causes of action or conclusively establish each element of an
affirmative defense.  Sci. Spectrum,
Inc., 941 S.W.2d at 911.  “When both
parties move for summary judgment and the trial court grants one motion and
denies the other, the reviewing court should review the summary judgment
evidence presented by both sides, determine all questions presented, and render
the judgment the trial court should have rendered.”  Mid-Continent Cas. Co. v. Global Enercom
Mgmt., Inc., 323 S.W.3d 151,
153–54 (Tex. 2010) (citing Tex.
Workers’ Comp. Comm’n v. Patient Advocates of Tex., 136 S.W.3d 643, 648
(Tex. 2004)).

II.      Insurance Policy Interpretation

Lexington contends
that it owed National no defense because Albemarle’s claims against National do
not fall within the policy’s insuring clause and are excluded by the policy
language.  The plain language of an insurance
policy, like that of any other contract, must be given effect when the parties’
intent may be discerned from it.  Utica Nat’l Ins. Co. of Tex. v. Am. Indem.
Co., 141 S.W.3d 198, 202 (Tex. 2004).  If the policy language has only one reasonable
interpretation, then it is not ambiguous, and we construe it as a matter of
law.  Fiess
v. State Farm Lloyds, 202 S.W.3d 744, 746 (Tex. 2006); Am. Mfrs. Mut. Ins. Co. v. Schaefer, 124 S.W.3d 154, 157 (Tex. 2003).
 If the contract is susceptible to two or
more reasonable interpretations, then it is ambiguous and we must resolve the
uncertainty by adopting a construction that favors the insured as long as that
construction is not unreasonable.  Fiess, 202 S.W.3d at 746 (citing Nat’l Union Fire Ins. Co. v. Hudson Energy
Co., 811 S.W.2d 552, 555 (Tex. 1991)). 
“When interpreting an insurance contract, we ‘must adopt the
construction of an exclusionary clause urged by the insured as long as that
construction is not unreasonable, even if the construction urged by the insurer
appears to be more reasonable or a more accurate reflection of the parties’
intent.’”  Evanston Ins. Co. v. ATOFINA Petrochems., Inc., 256 S.W.3d 660, 668
& n.25 (Tex. 2008) (quoting Nat’l
Union Fire Ins. Co., 811 S.W.2d at 555). “‘Exceptions or limitations on
liability are strictly construed against the insurer and in favor of the
insured,’ and ‘[a]n intent to exclude coverage must be expressed in clear and
unambiguous language.’”  Id. (quoting Nat’l Union Fire Ins. Co., 811 S.W.2d at 555).

A.      Duty
to defend

In contrast to the
duty to indemnify, which arises only if the facts actually established in the
underlying suit amount to a covered claim, the duty to defend arises if a
plaintiff’s factual allegations, read together with the insurance policy at
issue, potentially support a covered claim.  GuideOne
Elite Ins. Co. v. Fielder Rd. Baptist Church, 197 S.W.3d 305, 310 (Tex.
2006); see also Burlington N. & Santa
Fe Ry. v. Nat’l Union Fire Ins. Co., 334 S.W.3d 217, 219 (Tex. 2011).  Under this eight corners rule, the
allegations in the pleadings and the language of the insurance policy determine
an insurer’s duty to defend.  Nat’l Union Fire Ins. Co. v. Merchs. Fast
Motor Lines, Inc., 939 S.W.2d
139, 141 (Tex. 1997).  “Where the
complaint does not state facts sufficient to clearly bring the case within or
without the coverage, the general rule is that the insurer is obligated to
defend if there is, potentially, a case under the complaint within the coverage
of the policy.”  Heyden Newport Chem. Corp. v. S. Gen. Ins. Co., 387 S.W.2d 22, 26
(Tex. 1965) (internal quotation omitted), quoted
in Zurich Am., 268 S.W.3d at 491; King
v. Dallas Fire Ins. Co., 85 S.W.3d 185, 187 (Tex. 2002) (instructing that
courts resolve all doubts regarding duty to defend in favor of duty); see also Gore Design Completions, Ltd. v. Hartford Fire Ins. Co., 538 F.3d
365, 368 (5th Cir. 2008) (noting that “[t]he rule is very favorable to insureds
because doubts are resolved in the insured’s favor”).  

The duty to defend is
not affected by facts ascertained before suit, developed during litigation, or
by the ultimate outcome of the suit.  Trinity Universal Ins. Co. v. Cowan, 945
S.W.2d 819, 829 (Tex. 1997).  “Even if
the allegations are groundless, false, or fraudulent, the insurer is obligated
to defend.”  Zurich Am., 268 S.W.3d at 491.  Further, “[i]f a complaint potentially
includes a covered claim, the insurer must defend the entire suit.”  Id.  An insurer must defend its insured against
suit as long as the allegations potentially give rise to at least one claim
covered by the insurance policy, regardless of the number of claims potentially
not covered.  See Utica Nat’l Ins. Co. v. Am. Indem. Co., 141 S.W.3d 198, 201–02
(Tex. 2004) (“A liability insurer is obligated to defend a suit if the facts
alleged in the pleadings would give rise to any claim within the coverage of
the policy.”).  Thus, an insurer may have
a duty to defend but, eventually, no obligation to indemnify.  Farmers
Tex. Cnty. Mut. Ins. Co. v. Griffin, 955 S.W.2d 81, 82 (Tex. 1997).

In general, we do not
consider matters outside the policy and the pleadings in determining whether
the allegations support a duty to defend.  Capital
Bank v. Commonwealth Land Title Ins. Co., 861 S.W.2d 84, 88 (Tex. App.—Houston
[1st Dist.] 1993, no writ). We will not read facts into the pleadings, nor will
we “imagine factual scenarios which might trigger coverage.”  Merchs.
Fast Motor Lines, 939 S.W.2d at 142. We therefore examine whether the
allegations in Albemarle’s petition together with the CGL policy language
impose a duty on Lexington to defend National in the Albemarle lawsuit because
the suit may potentially encompass a covered claim.  

1.       Coverage
under the insuring clause

Lexington contends that the
products liability insuring clause does not cover Albemarle’s claims because,
according to Lexington, “all of [Albemarle’s] allegations and damages arose
from or flowed from its need to repair or replace [National’s] damaged
product—the defective DHT.”  Lexington
cites Building Specialties, Inc. v.
Liberty Mutual Fire Insurance Co., 712 F. Supp. 2d 628 (S.D. Tex. 2010),
for the proposition that allegations of a defective product are not allegations
of “property damage,” and thus do not give rise to the duty to defend.  In that case, the district court considered
that the petition alleged defective work by the insured but did not allege that
the defective work “caused physical injury or loss of use.”  Id.
at 645.  

We agree with the legal principle,
but do not read the Albemarle complaint as Lexington suggests.  Albemarle alleged damages in addition to
repair and replacement costs—namely, “other incidental and consequential
damages due to the defective condition of the DHT,” and that its injection
wells were forced to stop operation “while being repaired,” not, as Lexington
would read it, “while [the DHT] was being repaired.”  Contrary to Lexington’s interpretation, we do
not read these additional allegations as merely reiterating the plea for repair
and replacement of the DHT.  

Lexington attacks Albemarle’s plea
for “incidental and consequential damages” as conclusory and not the kind of
factual allegation that can trigger a duty to defend.  In its support, Lexington cites Clemons v. State Farm Fire & Casualty
Co., in which our sister court held that the plaintiff’s prayer for relief
for “other and further relief to which plaintiffs may be justly entitled” was
not a factual allegation of the insureds’ “potential liability for ‘injury to
or destruction of property, including the loss of use thereof’ within the
meaning of the property damage provision of the insurance policies.”  879 S.W.2d 385, 392 (Tex. App.—Houston [14th
Dist.] 1994, no pet.).  The court rightly
observed that a holding to the contrary would mean that every petition “seeking
‘other and further relief would precipitate a duty to defend.”  Id.
at 393.  

That danger is not present here
because Albemarle’s request for “incidental and consequential damages” is more
than a catch-all.  The pleadings indicate
that the DHT is only one component of Albemarle’s manufacturing facilities.  In the phase of its manufacturing process
relevant to this case, Albemarle’s pleadings explain that, after removing the
bromide ions from the brine, “[t]he remaining ‘tail brine’ is then transported
through surface piping to ‘disposal’ or ‘injection’ wells, through which the
tail brine is returned to subsurface reservoirs.”  In recounting the events giving rise to its
claim against National, Albemarle alleged that it “conducted an investigation
and found that the DHT was failing by splitting, separating, or leaking in
various disposal wells.  These failures
made it impossible for Albemarle to continue its operations in several of its
disposal wells.”  

Lexington contends that these
allegations mean only that Albemarle had to stop its operations so that it
could repair and replace the DHT, and that the other parts of the piping and
wells were unaffected.  We agree that
this is a reasonable interpretation, but it is not the only one.  Another possible interpretation is that the
failure of the DHT caused damage to the wells themselves, as they suffered and
were out of commission “while being repaired.” 
This alternate construction, together with an express claim for
incidental and consequential damages, supports a duty to defend.[1]  

Unlike the pleadings in Clemons and Building Specialties, the pleadings here reasonably can be read to
allege a causal connection between the failure of the pipe and damage to the
injection or disposal wells.  “Where an
ambiguity involves an exclusionary provision of an insurance policy, we must
adopt the construction urged by the insured as long as that construction is not
unreasonable, even if the construction urged by the insurer appears to be more
reasonable or a more accurate reflection of the parties’ intent.”  Balandran
v. Safeco Ins. Co. of Am., 972 S.W.2d 738, 741 (Tex. 1988) (internal
quotation omitted), quoted in Gilbert Tex. Constr., L.P. v. Underwriters
at Lloyd’s London, 327 S.W.3d 118, 133 (Tex. 2010).  Construing the pleadings favorably to the
insured, we hold that Albemarle’s plea for “other incidental and consequential
damages” encompasses alleged property damage beyond repair of the product
itself, thus asserting a claim potentially covered under the products liability
insuring clause of the policy.

                   2.       Effect of policy exclusions

          According
to Lexington, Albemarle’s claimed damages are excluded under the policy under
two clauses.  Under the first, the
products liability insuring clause does not apply to “Property Damage to the
Assured’s Products arising out of such products or any part of such
products.”  The second clause invoked by
Lexington excludes coverage for “[t]he withdrawal, recall, return, repair, or
replacement, or loss of use of the Assured’s products or work completed by the
Assured.”  Lexington points to
Albemarle’s detailed allegations relating to the repair and replacement damages
resulting from the defective DHT and dismisses as meaningless boilerplate the
phrase “other incidental and consequential damages,” contending that it is not
enough that “this phrase could refer
to damage caused by their products to property other than the defective
products themselves and that, as a result, such might [] fall within an exception to the policy’s exclusions of
product liability coverage.”  This
contention misapprehends the eight corners rule.  See
Zurich Am., 268 S.W.3d at 491, 495–96 (observing that duty to defend is
triggered by inclusion of claims that might
be covered and that generally, insurer is obligated to defend if case potentially falls within coverage of
policy).  That “other incidental and
consequential damages” is a vague, possibly ambiguous factual allegation, does
not render it meaningless for purposes of determining whether Lexington has a
duty to defend National in the Albemarle suit, given the entirety of the
pleading.[2]  See,
e.g., Zurich Am., 268 S.W.3d at 492–93 (construing allegations of “biological
injury” or “biological effects” and unspecified compensatory damage claims—referred to in pleadings as “including, but not
limited to” and “consisting, among other things” as covered “damages because of
bodily injury” for purposes of duty to defend); see generally Coker v. Coker, 650 S.W.2d 391, 394 (Tex. 1983) (“Courts
must favor an interpretation that affords some consequence to each part of the
instrument so that none of the provisions will be rendered meaningless.”).  Albemarle’s pleadings show that its
manufacturing process involves more than pipe, and its reference to “other
incidental and consequential damages” is reasonably construed as referring to
damages beyond those requiring repair and replacement of the DHT itself.  Resolving any uncertainty in favor of
National, the insured, we hold that the cited exclusions do not apply to
Albemarle’s damages allegations.  See, e.g., Travelers Ins. Co. v. Volentine,
578 S.W.2d 501, 503–04 (Tex. Civ. App.—Texarkana 1979, no writ) (holding that
third party pleading alleged possibly covered claims where insured’s work or
work product was repair of automotive valves only; other parts of automobile
engine would constitute “other property” under rule for interpreting exclusion,
and thus policy affords coverage to extent other parts were damaged or
destroyed); Martco Ltd. P’ship v.
Wellons, Inc., 588 F.3d 864, 882–83 (5th Cir. 2009) (interpreting similar
policy language and finding no exclusion where defective workmanship caused
damage to property other than insured’s own product); Wilshire Ins. Co. v. RJT Constr., LLP, 581 F.3d 222, 227–28 (5th
Cir. 2009) (holding that exclusion precluded coverage claims for repair and
replacement of faulty foundation but not for allegations of damage to parts of
house resulting from allegedly faulty foundation, so that insurer was required
to defend entire suit); Fed. Mut. Ins.
Co. v. Grapevine Excavation, Inc., 197 F.3d 720, 722, 728 (5th Cir. 1999)
(holding that allegations of improper subsurface backfilling resulting in
damage to parking lot triggered duty to defend and did not fall within impaired
property exclusion because replacing the backfill would not, in itself, fix
damage to lot’s surface), modified on
other grounds, 241 F.3d 396 (5th Cir. 2001).

III.    Notice
of Exhaustion of Self-Insured Retention

          Lexington
further complains that National is not entitled to recover its costs because it
failed to notify Lexington as soon as it had exhausted the SIR.  Lexington relies on a sentence in its April
2006 reservation of rights letter to National in which it requested that
National provide notice “[a]t such time as it appears likely that the SIR will
be fully eroded.”  Lexington does not
dispute that National complied with the policy’s requirement that it “report
any occurrence, claim or suit which may serve to deplete the self insured
retention by 50% or more,” but contends that either this request imposed on
National an additional requirement to notify when the SIR was exhausted.  We reject this contention.  A unilateral request in a reservation of
rights letter cannot create duties beyond those set forth in the policy.  Tex.
Ass’n of Cnties. Risk Mgmt. Pool v. Matagorda Cnty., 52 S.W.3d 128, 131–32
(Tex. 2000).  Moreover, the policy’s
merger clause bars the possibility of any extracontractual duties relating to
Lexington’s reporting of the Albemarle claims and their status.  National complied with the notice provisions
of the policy.  We hold that the trial
court properly refused to recognize the additional duty urged by Lexington. 

IV.     Summary
Judgment on National’s Counterclaims

          Finally,
Lexington challenges the trial court’s grant of summary judgment on National’s
claims for breach of contract and violation of the Texas Insurance Code.  First, it contends that there was no duty to
defend.  Our holding that the policy
provides coverage for the defense of the Albemarle suit leads to the conclusion
that these challenges lack merit. 
Second, Lexington contends that the trial court erred in rejecting its
claim that National, as a self-insurer, had an obligation to contribute to its
own defense and, consequently, the fees should have been apportioned.  Lexington relies on the policy section
providing that: “When both this insurance and other insurance apply to the loss
on the same basis, whether primary, excess, or contingent, the Underwriters
shall not be liable on [this policy] for a greater proportion of the loss than
stated in the applicable contribution provision . . . .”  This policy language does not support
Lexington’s interpretation.  Texas law is
well-settled that a self-insured retention is not “other insurance” within the
meaning of an “other insurance” clause.  See Hertz Corp. v. Robineau, 6 S.W.3d
332, 335 (Tex. App.—Austin 1999, no pet.); Home
Indem. Co. v. Humble Oil & Ref. Co., 314 S.W.2d 861, 863 (Tex. Civ. App.—Dallas),
writ ref’d n.r.e. per curiam, 317
S.W.2d 515 (1958) (endorsing court of appeals’ holding that self-insurance was
not “valid and collectible insurance” under policy); accord Travelers Lloyds Ins.
Co. v. Pac. Emp’rs Ins. Co., 602 F.3d 677, 684–85 (5th Cir. 2010) (applying
Texas law).  Lexington thus had a duty to
pay all of National’s reasonable defense costs, and its failure to make prompt
payment of the defense costs in excess of the SIR supports the trial court’s
summary judgment on these claims.  

Conclusion

          We
hold that the trial court properly granted summary judgment on the basis that
Lexington had a duty to defend National in the Albemarle suit and was liable
for National’s attorney’s fees and expenses in excess of the self-insured
retention.  We therefore affirm the
judgment of the trial court.

 

 

                                                                   Jane
Bland

                                                                   Justice


 

Panel
consists of Chief Justice Radack and Justices Alcala and Bland.

 











[1]
          For this reason, Lexington’s
reliance on National Union Fire Insurance.
Co. v. Merchants Fast Motor Lines, 939 S.W.2d 139 (Tex. 1997), is
misplaced.  In National Union, the policy issued to Merchants covered “damages
because of bodily injury or property damage . . . caused by an accident and
resulting from the ownership, maintenance or use of a covered auto.”  Id.
at 141.  The plaintiff’s pleadings in the
underlying case alleged that one of Merchants’s employees was operating a
company truck when he “negligently discharged a firearm and caused a bullet to
strike” and mortally injure a passenger in a nearby vehicle.  Id.  According to the supreme court those
allegations “do not suggest even a remote causal relationship between the
truck’s operation and [the passenger’s] injury and do not create that degree of
doubt which compels resolution of the issue for the insured.”  Id.
at 141–42.  The court thus held that the
pleadings did not give rise to a duty to defend.  Id.
at 142.  





[2]
          In urging the application of the
exclusion clauses, Lexington points to Valmont
Energy Steel, Inc. v. Commercial Union Insurance Co., 359 F.3d 770 (5th
Cir. 2004), and National Union Fire Insurance
Co. v. Puget Plastics Corp., 450 F. Supp. 2d 682 (S.D. Tex. 2006).  In Valmont
Energy, the Fifth Circuit held that the insurer did not owe indemnification
where a similar “your product” exclusion barred coverage for property damage to
steel flanges the insured sold to a third party arising from the insured’s
representations made with respect to the quality of its product.  359 F.3d at 776.  In Puget
Plastics, the federal district court, under Texas law, held that the
insurer did not owe indemnification where the “your product” exclusion
precluded coverage for costs to repair and replace the insured’s own product, a
component part used in tankless water heaters. 
450 F. Supp. 2d at 696–97.  Both
of those cases involve an insurer’s duty to indemnify, and thus apply a very
different, more stringent analysis than the one we apply to determine whether
the pleadings trigger a duty to defend. 
In any event, Albemarle’s pleadings allege the type of situation in
which the Puget Plastics court would
find coverage—that is, where the defective component caused damage to “the
water heaters or the homes and businesses in which the heaters were installed,”
for instance, if the component leaked and caused water damage.  See id.
at 704.