# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 11-10166

United States Court of Appeals
Fifth Circuit

**FILED**

October 29, 2014

Lyle W. Cayce
Clerk

DOUG CROWNOVER and KAREN CROWNOVER,

Plaintiffs - Appellants

v.

MID-CONTINENT CASUALTY COMPANY,

Defendant - Appellee

Appeals from the United States District Court
for the Northern District of Texas

## ON PETITION FOR REHEARING

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

JAMES L. DENNIS, Circuit Judge:

The petition for panel rehearing is GRANTED. The prior opinion, *Crownover v. Mid-Continent Casualty Co.*, 757 F.3d 200 (5th Cir. 2014), is WITHDRAWN, and the following opinion is substituted:

Doug and Karen Crownover contracted with Arrow Development, Inc. ("Arrow") to construct a house for them. Arrow performed defective work and then failed promptly to correct the work. The Crownovers spent a significant amount of money paying to correct the work themselves. An arbitrator found Arrow liable to the Crownovers for breaching its express warranty to repair non-conforming work and awarded them damages. Because Arrow filed for

bankruptcy, however, the Crownovers were limited to recovering what they could from Arrow's insurance policies. They therefore sued Mid-Continent Casualty Co. ("Mid-Continent"), Arrow's insurer, in federal court for the damages owed to them by Arrow, and both sides moved for summary judgment. The principal question in this diversity case is whether a contractual provision in the construction contract between the Crownovers and Arrow, which obligated Arrow to repair its work where that work failed to conform to the requirements of the construction contract, was an "assumption of liability" that exceeded Arrow's liability under general Texas law, thereby triggering a "contractual-liability exclusion" in Arrow's insurance contract with Mid-Continent. If the contractual-liability exclusion does not apply, the question becomes whether any other exclusion from coverage applies.

The district court held that the contractual-liability exclusion in Arrow's contract with Mid-Continent prevented indemnity and granted summary judgment for Mid-Continent. We conclude that, consistent with Texas law and considering the Texas Supreme Court's decisions in *Gilbert Texas Construction, L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118 (Tex. 2010), and *Ewing Construction Co. v. Amerisure Insurance Co.*, 420 S.W.3d 30 (Tex. 2014), the contractual-liability exclusion from coverage does not apply and therefore Mid-Continent was not entitled to summary judgment on that ground. We further conclude that no other exclusion from coverage forecloses the Crownovers' claim. Accordingly, we REVERSE summary judgment for Mid-Continent, RENDER summary judgment for the Crownovers, and REMAND for calculation of legal fees.

No. 11-10166

## BACKGROUND

### I.

In October 2001, the Crownovers entered into a construction contract with Arrow to construct a home on their land in Sunnyvale, Texas. The contract also contained a warranty-to-repair clause, which in paragraph 23.1 provided that Arrow would "promptly correct work . . . failing to conform to the requirements of the Contract Documents." The work was completed in November 2002, but by early 2003, cracks began to appear in the walls and foundation of the Crownovers' home. Additional problems with the heating, ventilation, and air conditioning ("HVAC") system caused leaking in exterior lines and air ducts inside the home. To compensate for defects in the HVAC system, the system's mechanical units ran almost continuously in order to heat or cool the house. As a result of being overburdened, the mechanical units ultimately had to be replaced. In all, the Crownovers paid several hundred thousand dollars to fix the problems with the foundation and HVAC system.

### II.

The Crownovers attempted to have Arrow correct the problems and eventually sought legal relief. Their demand letters were forwarded to Mid-Continent, but to no avail. The Crownovers then initiated an arbitration proceeding against Arrow. The arbitrator found that the HVAC system "was not installed properly, did not perform as required, and exhibited numerous deficiencies as identified by the various consultants and contractors who evaluated the system," and determined that "Arrow is responsible for the costs associated with replacement of the HVAC system, less betterment." The arbitrator also found that the foundation failed and that Arrow was responsible for the costs of repairing the foundation. Accordingly, the arbitrator concluded that the Crownovers had a meritorious claim for breach of the express

warranty to repair contained in paragraph 23.1 of their contract with Arrow, which was not barred by the statute of limitations. Because the arbitrator awarded damages to the Crownovers on that ground, she declined to decide whether the Crownovers' other claims were barred by a statute of limitations.

Arrow later filed for bankruptcy. In June 2009, the bankruptcy court lifted the automatic stay but limited the Crownovers' recovery to any amount they could recover from an applicable insurance policy. (To date, Arrow has not paid the Crownovers any money.) In July 2009, the Crownovers sent a letter to Mid-Continent, demanding that the insurance company pay the arbitration award. Mid-Continent denied their demand in August 2009, citing several insurance policy defenses and exclusions.

The Crownovers then sued Mid-Continent for breach of contract. Both sides moved for summary judgment. Ultimately, the district court granted Mid-Continent's motion and denied the Crownovers' motion. In its opinion, the district court examined an "Insuring Agreement," a provision that appeared (in exactly the same form) in a series of comprehensive general liability ("CGL") policies, by which Mid-Continent insured Arrow, from August 2001 through 2008. The district court concluded that the Insuring Agreement covered Arrow while it constructed the Crownovers' home. The Insuring Agreement states that Mid-Continent "will pay those sums that [Arrow] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."

Several exclusions apply to this general coverage provision. The district court concluded that one of them, the contractual-liability exclusion, applied in the instant case, such that Mid-Continent was not obligated to indemnify Arrow for the damages it owed the Crownovers. This exclusion states that "[t]his insurance does not apply to[] 'property damage' for which the insured is

No. 11-10166

obligated to pay damages by reason of the assumption of liability in a contract or agreement." There is, however, an exception to this exclusion for "liability . . . [t]hat the insured would have in the absence of the contract or agreement." The district court noted that the arbitration award to the Crownovers was based only on Arrow's breach of the express warranty to repair contained in paragraph 23.1 (the arbitrator explicitly declined to decide whether Arrow was liable to the Crownovers on any other ground). Thus, the district court held that because Arrow "became legally obligated to pay the arbitration damages on the basis of [its] contractually assumed liability," the contractual-liability exclusion applied with no applicable exception to the exclusion. The district court did not rule on Mid-Continent's other alleged exclusions from coverage.

The Crownovers had argued that the district court should consider whether Arrow would have been liable in the absence of the express warranty to repair. Specifically, they had contended that the "implied warranty of good workmanship" continued to apply to the contract they had with Arrow because the contract contained no express disclaimer of such a warranty. The district court declined to adopt this argument. First, it noted that under *Gilbert*, 327 S.W.3d 118, it was confined to the actual facts of the case and could not consider hypothetical scenarios. Second, the district court reasoned that when a contract contains an express warranty of good workmanship, that warranty supersedes any implied warranty of the same.

The Crownovers subsequently filed motions for a new trial, to amend or modify the judgment, and for relief from the judgment, arguing that the district court had erred in ruling on implied warranties, a ground that had not been raised in Mid-Continent's motion for summary judgment. They further argued that no such waiver or disclaimer exists under Texas law. The district court denied their motions, finding that the Crownovers had raised the implied

5

No. 11-10166

warranty issue in their briefing and that Mid-Continent was thus allowed to respond to their argument in its sur-reply.  The district court also adhered to its earlier reasoning that the express warranty of good workmanship superseded any implied warranty of the same.  The Crownovers timely appealed.

## STANDARD OF REVIEW

"[We] appl[y] a *de novo* standard of review when determining whether a district court erred in granting summary judgment." *LaBarge Pipe & Steel Co. v. First Bank*, 550 F.3d 442, 449 (5th Cir. 2008).  Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 417 (5th Cir. 2008).  "[S]ubstantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "When, as here, jurisdiction is based on diversity, we apply the substantive law of the forum state." *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010).  Thus, in this case, Texas law determines which facts are material.

## DISCUSSION

In light of the Texas Supreme Court's controlling analysis in *Gilbert* and *Ewing*, we conclude that the contractual-liability exclusion to coverage does not apply to bar the Crownovers' suit.  We also hold that the alternative exclusions from coverage raised by Mid-Continent are inapplicable under the facts established here.  We therefore hold that the Crownovers, rather than Mid-Continent, are entitled to summary judgment.

No. 11-10166

## I.

Under Texas law, "the insured has the [initial] burden of establishing coverage under the terms of the policy." *Gilbert*, 327 S.W.3d at 124 (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). "If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion." *Id.* (citing *Ulico Cas. Co.*, 262 S.W.3d at 782). "If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Id.* (citing *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 193 (Tex. Ct. App. 2003)).

"The principles [Texas] courts use when interpreting an insurance policy are well established." *Id.* at 126.

> Those principles include construing the policy according to general rules of contract construction to ascertain the parties' intent. First, we look at the language of the policy because we presume parties intend what the words of their contract say. We examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless. The policy's terms are given their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense. Courts strive to honor the parties' agreement and not remake their contract by reading additional provisions into it.

*Id.* (citations omitted). We follow this framework in resolving the instant dispute.

## II.

### A.

In *Gilbert*, the Texas Supreme Court held that a contractual-liability exclusion applied to bar recovery where the only viable claim was for breach of contract, since all other claims were barred by governmental immunity. The insured party was Gilbert Texas Construction ("Gilbert"), which contracted

with the Dallas Area Rapid Transit Authority ("DART") to build a light rail system. *Id.* at 121-22. As part of the contract, Gilbert agreed to "protect from damage . . . adjacent property of a third party . . . [and] repair any damage to those facilities, including those that are the property of a third party, resulting from failure to comply with the requirements of this contract or failure to exercise reasonable care in performing the work." *Id.* at 122. "During construction, Dallas suffered an unusually heavy rain, and a building adjacent to the construction area flooded." *Id.* The adjacent building's owner ("RTR") sued Gilbert, among others, under various theories of liability, including tort and breach of contract. *Id.* Based on defenses of governmental immunity, the trial court granted motions for summary judgment on all claims except RTR's breach of contract claims against Gilbert. *Id.* at 123. Gilbert eventually settled with RTR, but Gilbert's insurer, Lloyd's of London ("Lloyd's"), refused to indemnify Gilbert on the ground that the contractual-liability exclusion applied. *See id.* at 122-23. Gilbert sued Lloyd's, and the case eventually reached the Texas Supreme Court. *Id.*

The Texas Supreme Court laid out the steps for determining whether a contractual-liability exclusion applies:

> [1] Initially, the insured has the burden of establishing coverage under the terms of the policy. [2] If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion. [3] If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage.

*Id.* at 124 (citations omitted). Applying this framework, the *Gilbert* court first noted that Lloyd's did not deny that RTR's claim was within the general terms of the policy. *Id.* at 125. The Texas Supreme Court next explained that the contractual-liability exclusion "means what it says: it excludes claims when the insured assumes liability for damages in a contract or agreement, except

. . . when the insured would be liable absent the contract or agreement." *Id.* at 128; *see also Ewing*, 402 S.W.3d at 37 ("[W]e . . . determined in *Gilbert* that 'assumption of liability' means that the insured has assumed a liability for damages that exceeds the liability it would have under general law." (citing 327 S.W.3d at 127)). The court concluded that Gilbert had "assumed" liability by taking on liability in its contract that it would not otherwise have had under the law:

> Independent of its contractual obligations, Gilbert owed RTR the duty to comply with law and to conduct its operations with ordinary care so as not to damage RTR's property[] . . . . In its contract with DART, however, Gilbert undertook a legal obligation to protect improvements and utilities on property adjacent to the construction site, and to repair or pay for damage to any such property "resulting from a failure to comply with the requirements of this contract *or* failure to exercise reasonable care in performing the work." (emphasis added). The latter obligation—to exercise reasonable care in performing its work—mirrors Gilbert's duty to RTR under general law principles. The obligation to repair or pay for damage to RTR's property "resulting from a failure to comply with the requirements of this contract" extends beyond Gilbert's obligations under general law and incorporates contractual standards to which Gilbert obligated itself.

*Gilbert*, 327 S.W.3d at 127.

Since governmental immunity foreclosed all of RTR's theories of liability apart from breach of contract, all that remained was RTR's claim that Gilbert had breached the contract by causing damage "resulting from a failure to comply with the requirements of th[e] contract." *See id.* When Gilbert settled with RTR (a stranger to the contract), its "only potential liability remaining in the lawsuit was liability in excess of what it had under general law principles." *Id.* Thus, the court concluded that RTR's breach-of-contract claim "was founded on an obligation or liability contractually assumed by Gilbert within the meaning of the policy exclusion." *Id.*; *see also Ewing*, 420 S.W.3d at 36 ("In

other words, Gilbert did not contractually assume liability for damages within the meaning of the policy exclusion unless the liability for damages it contractually assumed was greater than the liability it would have had under general law—in Gilbert's case, negligence.").

The *Gilbert* court then considered whether the exception to the exclusion brought Gilbert's liability to RTR back into coverage. *See* 327 S.W.3d at 133-35. The relevant exception stated that the exclusion "does not apply to liability for damages . . . [t]hat the insured would have in the absence of the contract or agreement." *Id.* at 133 (alterations in original). To determine whether the exception applied, the court ruled that it had to "decide whether Gilbert proved it would have had liability for RTR's damages absent its contractual undertaking." *Id.* at 134. The court pointed out, however, that "[b]ecause RTR's tort claims were properly dismissed, the only viable claim underlying Gilbert's settlement was for breach of contract." *Id.* Thus, the court held "[t]he exception for liability for damages Gilbert would have in the absence of the DART contract is inapplicable where, as here, the insured has governmental immunity and liability is based on its contract." *Id.* at 135.

**B.**

Following oral argument in this case, a panel of this court certified two questions to the Texas Supreme Court that are germane to the Crownovers' dispute with Mid-Continent. *See Ewing Constr. Co. v. Amerisure Ins. Co.*, 690 F.3d 628, 633 (5th Cir. 2012). Those questions were:

> 1. Does a general contractor that enters into a contract in which it agrees to perform its construction work in a good and workmanlike manner, without more specific provisions enlarging this obligation, "assume liability" for damages arising out of the contractor's defective work so as to trigger the Contractual Liability Exclusion.

2. If the answer to question one is "Yes" and the contractual liability exclusion is triggered, do the allegations in the underlying lawsuit alleging that the contractor violated its common law duty to perform the contract in a careful, workmanlike, and non-negligent manner fall within the exception to the contractual liability exclusion for "liability that would exist in the absence of contract."

*Id.* The Texas Supreme Court answered the first question "no" and did not answer the second question, *Ewing*, 420 S.W.3d at 31.

Ewing had entered into a contract with the Tuluso-Midway Independent School District ("TMISD") "to serve as general contractor to renovate and build additions to a school in Corpus Christi, including constructing tennis courts." *Id.* at 31. "Shortly after construction of the tennis courts was completed," however, "TMISD complained that the courts started flaking, crumbling, and cracking, rendering them unusable for their intended purpose of hosting competitive tennis events." *Id.* TMISD then brought suit against Ewing; "[i]ts damages claims against Ewing were based on faulty construction of the courts and its theories of liability were breach of contract and negligence." *Id.* at 31-32.

Ewing tendered defense of the underlying suit to its insurer, Amerisure Insurance Co. ("Amerisure"), under an insurance policy that included CGL coverage. *Id.* at 32. Amerisure denied coverage, and Ewing brought suit, seeking "a declaration that Amerisure had, and breached, duties to defend Ewing and indemnify it for any damages awarded to TMISD in the underlying suit." *Id.* Amerisure "urged that policy exclusions, including the contractual

liability exclusion, precluded coverage and negated its duties to defend and indemnify."[1] *Id.*

As in this case, "[t]he contractual liability exclusion in Amerisure's policy exclude[d] claims for damages based on an insured's contractual assumption of liability except . . . where the insured's liability for damages would exist absent the contract." *Id.* at 36. Amerisure, relying on *Gilbert*, argued that the contractual-liability exclusion applied "because Ewing contractually undertook the obligation to construct tennis courts in a good and workmanlike manner and thereby assumed liability for damages if the construction did not meet that standard." *Id.* Ewing, distinguishing *Gilbert*, argued that its "agreement to construct the courts in a good and workmanlike manner d[id] not enlarge its obligations beyond any general common-law duty it might have," namely, "the obligation it ha[d] under general law to comply with the contract's terms and to exercise ordinary care in doing so." *Id.* The Texas Supreme Court agreed with Ewing. *Id.*

The court first noted that "TMISD's claims that Ewing failed to perform in a good and workmanlike manner and its claims that Ewing negligently performed under the contract [were] substantively the same" and then observed that Ewing "had a common law duty to perform its contract with skill and care." *Id.* at 37. On this basis, the court held that "a general contractor who agrees to perform its construction in a good and workmanlike manner, without more, does not enlarge its duty to exercise ordinary care in fulfilling its contract" and "thus does not 'assume liability' for damages arising out of its

---

[1] Contrary to Mid-Continent's assertions, claims for both a duty to defend and a duty to indemnify were considered by the *Ewing* court. *See* 420 S.W.3d at 32-34. Thus, its reasoning and holding are squarely applicable to the Crownovers' claim that Mid-Continent must indemnify Arrow for the arbitration award.

defective work so as to trigger the Contractual Liability Exclusion." *Id.* at 38. The Texas Supreme Court therefore answered the first certified question from this court "no" and declined to address the second question.[2]

### III.

### A.

The arbitrator in this case found in favor of the Crownovers, concluding that Arrow had breached the express warranty to repair contained in paragraph 23.1 of their construction contract. That paragraph obligated Arrow to "promptly correct work . . . failing to conform to the requirements of the Contract Documents." Mid-Continent now argues that the contractual-liability exclusion in its insurance contract with Arrow prevents the Crownovers from enforcing the arbitration award against Mid-Continent. The Insuring Agreement requires Mid-Continent to "pay those sums that [Arrow] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies." The contractual-liability exclusion, however, provides that "[t]his insurance does not apply to[] 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." As an initial matter, "the insured has the burden of establishing coverage under the terms of the policy." *Gilbert*, 327 S.W.3d at 124. The district court did not rule on this issue, but *Gilbert* requires us first to determine whether the Crownovers can show coverage. *See id.*

To establish coverage under the CGL contract, the Crownovers must demonstrate an "occurrence" causing "property damage," meaning injury to

---

[2] This court subsequently vacated the order of the district court granting summary judgment in favor of Amerisure on the ground that coverage was excluded under the contractual-liability exclusion and remanded the case to the district court for further proceedings. *See Ewing Constr. Co. v. Amerisure Ins. Co.*, 744 F.3d 917, 917-18 (5th Cir. 2014).

tangible property.  *See Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23-24 (Tex. 2008).  The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  The requirement that property damage be caused by an "occurrence" limits coverage in at least two ways—the "accident" requirement excludes coverage for intentional torts and the "continuous" element limits the number of occurrences that can stem from a single accident. *Id.* at 24.  Mid-Continent argues that because an "occurrence" must be an "accident," and since Texas has expansive clay soils, foundation movement was to be expected and therefore some amount of damage to the structural elements of the house was natural.  Mid-Continent claims that the Crownovers have not proved that an "occurrence" caused "property damage" because they have not shown that the cracks in their home were caused by *excessive* foundation movement.

The policy defines "property damage," as "[p]hysical injury to tangible property, including all resulting loss of use of that property . . . [or][l]oss of use of tangible property that is not physically injured."  Interpreting a nearly identical CGL, the Texas Supreme Court has held that defective construction that caused a foundation to shift, thereby resulting in cracks in the interior and exterior of a house, was "property damage" caused by an "occurrence." *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16, 20 (Tex. 2007); *see also Wilshire Ins. Co. v. RJT Constr., LLC*, 581 F.3d 222, 225 (5th Cir. 2009) (interpreting a similar CGL policy under Texas law and stating that "cracks themselves are physical damage allegedly caused by the faulty foundation. . . . The cracks are not merely a warning of prior undiscovered damage; they are the damage itself. . . . The complaint's allegations trigger coverage unless an

14

exclusion is applicable.").[3] The evidence indicates that neither Arrow nor the Crownovers anticipated the cracks in the walls and foundation or the failure of the HVAC system. *See Lamar Homes*, 242 S.W.3d at 9 (finding an "occurrence" where "[n]o one allege[d] that [the contractor] intended or expected its work or its subcontractors' work to damage the DiMares' home."). Mid-Continent's claim, therefore, that some more excessive damage beyond cracks in the walls and the foundation is required for "property damage" to be caused by an "occurrence" is unavailing.

Mid-Continent also alleges that the damages awarded by the arbitrator for the HVAC system were not for "property damage" because the costs associated with replacing the HVAC system were not for physical injury to, or loss of use of, tangible property. Mid-Continent argues that the HVAC system would have to cause damage to some other property in order to be covered; the economic cost of replacing the faulty work itself is not "property damage." Indeed, the Texas Supreme Court has stated that, "faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage.'" *Lamar Homes*, 242 S.W.3d at 10. The Crownovers respond that the "property damage" was the damage to the HVAC units themselves due to being run almost continuously; they contend that they need not show that the HVAC units otherwise damaged the home. The Crownovers claim to have sought damages to cover only the cost of replacing the mechanical units, which were satisfactory at move-in but subsequently wore out.

---

[3] Even though the holding in *Wilshire* was based on a duty to defend, not indemnify, its reasoning remains relevant here. *See, e.g.*, *Ewing*, 420 S.W.3d at 34 ("Although this case involves both duties to defend and to indemnify, *Gilbert*'s interpretation of the contractual liability exclusion guides our determination.").

Mid-Continent alleges that the faulty workmanship that led to the need to replace the HVAC units "merely diminishe[d] the value of the home without causing property damage or loss of use." In support of this contention, Mid-Continent cites, *Building Specialties, Inc. v. Liberty Mutual Fire Insurance Co.*, 712 F. Supp. 2d 628, 646 (S.D. Tex. 2010), in which the Southern District of Texas held that the cost of repairing defective but undamaged air ducts was not attributable to "property damage." There, defective installation caused an air conditioner to drip condensate, but there was no allegation of actual property damage to the air conditioner itself or to anything else. *Id.* at 645. Thus, the court concluded that the plaintiff had failed to allege that the defective work caused physical damage or loss of use. *Id.* Here, the defective installation of the HVAC system caused the system to be deficient and eventually required the stressed mechanical units to be replaced. There can be no doubt that the HVAC units were themselves "tangible property," and therefore the loss of their use amounted to property damage. The HVAC units fall within the plain meaning of "tangible property" and no case cited by Mid-Continent suggests otherwise. *See Lamar Homes*, 242 S.W.3d at 8 ("Terms that are not defined in a policy are given their generally accepted or commonly understood meaning."); *see also Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 757 (Tex. 2013) (holding that cost of removing exterior insulation to check for water damage and cost of repairing such damage were both costs incurred "because of" property damage).

Therefore, Arrow's defective work was an "occurrence" that caused the HVAC system and the foundation to require repairs, which amounted to "property damage." The Crownovers thus met their initial burden of establishing coverage under the insurance policy.

No. 11-10166

**B.**

Once coverage is established, the burden shifts to Mid-Continent to show that the contractual-liability exclusion applies. *Gilbert*, 327 S.W.3d at 124. "Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured." *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) (internal quotation marks omitted). For the exclusion to apply, Mid-Continent must show that Arrow is obligated to pay the Crownovers "by reason of the assumption of liability in a contract or agreement," as stated in the Insuring Agreement. "'[A]ssumption of liability' means that the insured has assumed a liability for damages that exceeds the liability it would have under general law." *Ewing*, 420 S.W.3d at 37 (citing *Gilbert*, 327 S.W.3d at 127). "Otherwise, the words 'assumption of liability' are meaningless and are surplusage." *Ewing*, 420 S.W.3d at 37. Thus, under both *Ewing* and *Gilbert*, Mid-Continent must show that Arrow's express warranty to repair effected an assumption of liability that was not already covered by general law. The key question, therefore, becomes whether the source of adjudicated liability—the express duty to repair—expanded Arrow's obligations. We hold that it did not.

The arbitrator ruled in the Crownovers' favor based solely on Arrow's breach of its express warranty to repair in paragraph 23.1, which required it to "promptly correct work . . . failing to conform to the requirements of the Contract Documents." Thus, there were three elements of paragraph 23.1 that could potentially have triggered the contractual-liability exclusion: (1) it constituted an *express* rather than implied warranty; (2) it was a duty to *repair* rather than construct; (3) it referred to performance in conformity with the *contract* documents rather than simple competent performance. None of these

17

factors is dispositive and we conclude that not one of them (nor all of them together) extended Arrow's liability beyond its liability under general law.

*First*, Mid-Continent would have us hold that since the award was based on a contractual duty, the contractual-liability exclusion applies. *Ewing* makes clear that our task is not so simple. The question is not whether the obligation was contained in an express contractual provision, but whether that provision reflected an expansion of liability. *See Ewing*, 420 S.W.3d at 36 ("[A party does] not contractually assume liability for damages within the meaning of the policy exclusion unless the liability for damages it contractually assumed was greater than the liability it would have had under general law.").

In *Ewing*, the court held that an express contractual duty "to construct the [tennis] courts in a good and workmanlike manner did not add anything to the obligation it ha[d] under general law to comply with the contract's terms and to exercise ordinary care in doing so." *Id.* at 36. Therefore, the Texas high court held that the "express agreement to perform the construction in a good and workmanlike manner did not enlarge its obligations and was not an 'assumption of liability' within the meaning of the policy's contractual liability exclusion." *Id.* The issue is not whether the relevant duty is contractual; it is whether the contractual duty represents an *expansion* of liability. Indeed, the *Ewing* court stated that there is an "obligation . . . under general law to comply with the contract's terms." *Id.* "TMISD's allegations that Ewing failed to perform in a good and workmanlike manner are substantively the same as its claims that Ewing negligently performed under the contract because they contain the same factual allegations and alleged misconduct." *Id.* at 37. Thus, the fact that the arbitrator's award in this case was based on an express contractual duty, rather than an implied general-law duty, is inconsequential.

*Second*, there is no doubt that the general law provides a duty to repair. Both *Gilbert*, 327 S.W.3d at 127, and *Ewing*, 420 S.W.3d at 35, state that the obligation to repair or pay for damage resulting from failure to exercise reasonable care in performing work under a contract does not differ from liability for damages under general law. *Cf. Lennar Corp.*, 413 S.W.3d at 757 (holding costs associated with finding and repairing damage were "because of" property damage). Since general law establishes a duty to repair work that was not carried out in a good and workmanlike manner, it makes no difference that paragraph 23.1 refers to a duty to repair rather than a duty to perform the initial work with reasonable care. That is a distinction without a difference. The remedy for failure to fulfill the duty to repair is the same as for failure to perform work in a workmanlike manner; the remedy is the cost to repair the defective work. Paragraph 23.1, therefore, did not expand Arrow's liability simply because it was framed in terms of a duty to repair, as opposed to a duty to construct.

*Third*, paragraph 23.1's reference to the requirements of the contract documents did not increase Arrow's liability in any relevant manner. The contract between Arrow and the Crownovers, unlike in *Ewing*, does not recite the general law duty to perform construction work in a good and workmanlike fashion (or to repair damage resulting from a failure to perform in such a fashion). Instead, it states that there is a duty to correct work failing to conform to the requirements of the *contract* documents. While this complicates our analysis, it does not alter it fundamentally. It merely means that we need to look one step further. In *Ewing*, the Texas Supreme Court made clear that the contractual-liability exclusion does not apply merely because the relevant obligation was an express contractual duty; a court must determine whether that contractual duty actually represented an expansion of liability beyond

that established by general law.  *See Ewing*, 420 S.W.3d at 36 ("Gilbert did not contractually assume liability for damages within the meaning of the policy exclusion unless the liability for damages it contractually assumed was greater than the liability it would have had under general law.").  Just as Mid-Continent must establish more than that the duty to repair is an express duty found in the contract, Mid-Continent cannot avoid indemnification merely by noting that the duty to repair refers to the requirements of the contract documents.  We must determine whether that duty actually represents an expansion of obligations as applied.

The general law creates a duty to perform under the terms of a contract with reasonable care.  *See, e.g., Ewing*, at 37 ("Ewing . . . had a common law duty to perform its contract with skill and care."); *Sipes v. Langford*, 911 S.W.2d 455, 457 (Tex. Ct. App. 1995) ("Implicit in every contract is a common-law duty to perform the terms of the contract with care, skill and reasonable experience.").  Paragraph 23.1 articulates a duty to "promptly correct work . . . failing to conform to the requirements of the Contract Documents."  Essentially, this is a contractual obligation to carry out work consistently with one's contractual obligations.  Since there is a general law duty to perform the terms of a contract with reasonable care, it is unclear how Arrow's express duty to repair, without a showing that the "requirements of the Contract Documents" exceeded common law duties, could constitute an expansion of Arrow's obligations beyond those it owed under general law.  Mid-Continent has not shown that Arrow's duty to repair non-conforming work under the contract increased Arrow's liability; it has not been able to point to any relevant element of liability that was increased due to Arrow's failure to comply with the duty to repair clause.

The Crownovers claim that where Mid-Continent has failed to prove that the express duty to repair non-confirming work expanded Arrow's obligations, they have proven the converse. They allege that the arbitrator's findings of fact and resultant award demonstrate that coverage under paragraph 23.1 was well within the principles of general law. "[T]he insurer's duty to indemnify is determined based on the facts actually established in the underlying suit." *Burlington N. & Santa Fe Ry. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 334 S.W.3d 217, 219 (Tex. 2011). The arbitrator's award clearly lists the findings of fact that led it to conclude that Arrow violated its duty to repair. Mid-Continent is bound by the arbitrator's findings. *E.g., Mid-Continent Cas. Co. v. Castagna*, 410 S.W.3d 445, 452 (Tex. Ct. App. 2013). Under the facts as determined by the arbitrator, there can be little doubt that Arrow's adjudicated liability was no greater than that called for by general law. The arbitrator found that both the foundation and HVAC system began showing signs of problems shortly after the Crownovers moved in; the HVAC system was not installed properly, did not perform as required, exhibited numerous deficiencies and failures, and the units eventually had to be replaced; the foundation failed and Arrow did not repair it; and Arrow was responsible for the associated costs of repairing or replacing both the foundation and the HVAC system. The Crownovers submitted evidence that functional problems in the HVAC system caused the mechanical units to run excessively, such that replacement was ultimately necessary. Paragraph 23.1 did not expand Arrow's obligations by articulating a duty to repair such defects. This obligation is "substantively the same" as Arrow's obligations under general law. *See Ewing*, 420 S.W.3d at 37 (finding no expansion of liability where allegation of failure to perform in a workmanlike manner was "substantively the same" as claim of negligent performance under the contract "because they contain the same

factual allegations and alleged misconduct."). The Crownovers have convincingly shown that Arrow's adjudicated liability reflected a duty no broader than that required by general law, and Mid-Continent has failed to show otherwise.

Rather than demonstrate how paragraph 23.1 enlarged Arrow's obligations in any relevant sense, Mid-Continent stresses the similarity between the duty to repair here and the duty to repair in *Gilbert*. There, Gilbert undertook the "obligation to protect improvements and utilities on property adjacent to the construction site." *Gilbert*, 327 S.W.3d at 127. The *Gilbert* court held that "[t]he obligation to repair or pay for damage to RTR's property 'resulting from a failure to comply with the requirements of this contract' extend[ed] beyond Gilbert's obligations under general law and incorporate[d] contractual standards to which Gilbert obligated itself." *Id.* While this case also involves an express duty to repair work failing to conform to the requirements of contract documents, the pertinent liabilities in *Gilbert* are clearly distinguishable. In *Ewing*, the Texas Supreme Court stressed that the decision in *Gilbert* "involved 'unusual circumstances' because Gilbert ordinarily could have been liable in tort for damages to RTR absent its contract, but under the facts of the case, the only basis for Gilbert's liability to RTR was RTR's claim for Gilbert's breach of the contract with DART." *Ewing*, 420 S.W.3d at 36. *Gilbert* was a unique case because governmental immunity foreclosed all relief except relief sounding in contract. *See id.* It was therefore simply impossible for liability to be based on anything other than contract. Furthermore, Gilbert's contractual obligation that triggered the liability exclusion was its obligation to repair or pay for damage to property of "third parties" resulting from its failure to comply with its contract with DART. *Id.* Neither governmental immunity nor contractual language creating obligations

to third parties is present here.  While the arbitrator specifically held that Arrow had breached a contractual duty in this case, nothing prevents us from exploring whether the breach of the express duty to repair represented an actual expansion of liability beyond that provided by general law.  In fact, *Ewing* mandates that we conduct this analysis.  *See id.* at 37.  We hold that although Arrow's violation of its duty to repair reflected a breach of contract, Arrow's liability was no greater than what Texas general law conferred.

In sum, *Gilbert*, 327 S.W.3d at 124, 127, and *Ewing*, 420 S.W.3d at 37, maintain that for a contractual-liability exclusion to apply, the insurer must prove that a contractually-assumed duty effected an expansion of liability beyond that supplied by general law.  The arbitrator in this case determined that Arrow violated an express duty to repair work that did not conform to the requirements of its construction contract with the Crownovers.  Mid-Continent has failed to proffer evidence creating a dispute of fact as to whether the arbitrator's award was based on liability greater than that dictated by general law.  Therefore, the contractual-liability exclusion from coverage does not apply.  Because we conclude that the contractual-liability exclusion is inapplicable, we need not consider whether the Crownovers can establish an exception to that exclusion.  *See Gilbert*, 327 S.W.3d at 124.

## IV.

Mid-Continent proffered two additional exclusions from coverage in the event that the district court did not find the contractual-liability exclusion applicable.  The district court saw no cause to address these additional exclusions, having determined that the contractual-liability exclusion foreclosed the Crownovers' claim.  Since we disagree with the district court's conclusion, we must consider whether Mid-Continent's alternative arguments exclude the Crownovers' claim from coverage.

No. 11-10166

**A.**

Mid-Continent alleges that the "your work" exclusion contained in its insurance policy with Arrow bars coverage in this case. The first two policies (2001-02 and 2002-03) between Arrow and Mid-Continent contained the following exclusion:

This insurance does not apply to:

. . .

l.  Damage To Your Work

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard". [*sic*]

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

The second paragraph of the exclusion, which created an exception to the exclusion for work conducted by a subcontractor, was removed from the policies starting in August 2003. *See generally Lamar Homes*, 242 S.W.3d at 11-12 (discussing the history of the subcontractor exception). The provision "generally excludes coverage for 'property damage' to the insured's completed work with one notable exception for work performed for the insured by a sub-contractor." *Id.* at 11. "'With [the subcontractor exception], the insurance industry essentially agreed to cover a huge portion of faulty workmanship claims, particularly those arising out of home building or other construction.'" *Id.* at 12 n.12 (quoting 2 JEFFERY W. STEMPEL, STEMPEL ON INSURANCE CONTRACTS § 14 [13][D] at 14-224.9). The Crownovers contend that the property damage to the HVAC system and foundation arose after completion of the work and that the damage was to the subcontractor's work. Unless the subcontractor exception applies, their claim will fall squarely within the "your

24

work" exception, foreclosing indemnity.  As a result, the fulcrum of the Crownovers' argument on this point is that the property damage arose prior to August 2003, when the subcontractor exception was removed.

Mid-Continent argues that the foundation did not move "excessively," and thus did not give rise to "property damage," until June 2004 at the earliest. Mid-Continent bases this claim on its expert's affidavit and deposition testimony, in which he opined that the foundation first exceeded deflection limits (as defined by the Texas Section of the American Society of Civil Engineers ("ASCE")) within six to nine months of March 2005.  Mid-Continent cites to no authority, however, for the proposition that deflection limits as defined by the ASCE provide the threshold for a finding of property damage. Indeed, available case law suggests otherwise.  For example, this court has applied Texas law to hold that cracks in the walls of a structure can constitute property damage, thus triggering coverage under a CGL.  *Wilshire*, 581 F.3d at 225 ("The complaint alleges that 'cracks in the walls and ceilings' were 'suddenly appearing' in late 2005.  The cracks themselves are physical damage allegedly caused by the faulty foundation. . . . [T]hey are the damage itself.").

The uncontested evidence indicates that cracks in the walls and concrete, as well as damage to the HVAC system, appeared within six months after the Crownovers moved into their home, in late November 2002.  The arbitration award indicates that "[b]oth the HVAC system and the foundation began showing signs of problems in the year following substantial completion of the home."  Thus, the evidence establishes that the damage first occurred before August 2003.  That the damage to the Crownovers' home continued to worsen thereafter does not alter the fact that the damage had already occurred before the subcontractor exception had been removed from the insurance policy.  *See Don's Bldg. Supply*, 267 S.W.3d at 22 ("the insurer's duty is triggered under

Texas law[] . . . when injury happens"); *Landstar Homes Dall., Ltd. v. Mid-Continent Cas. Co.*, No. 3:10-CV-0014-K, 2010 WL 5071688, at *7 (N.D. Tex. Dec. 13, 2010) (unpublished) (holding, under similar circumstances, that damage first occurred before the subcontractor exception was removed from the CGL policy and therefore dismissing Mid-Continent's claims that a significant proportion of the damage to the home occurred after work performed by subcontractors was no longer covered); *see also Lennar*, 413 S.W.3d at 758 ("For damage that occurs during the policy period, coverage extends to the 'total amount' of loss suffered as a result, not just the loss incurred during the policy period."). Because the evidence establishes that the defective work was performed by Arrow's subcontractors and that the damage first arose while the subcontractor exception to the "your work" exclusion was still in effect, the "your work" exclusion does not prevent coverage in this case.

**B.**

Lastly, Mid-Continent alleges that exclusions j(5) and j(6) bar the Crownovers' claim for indemnification. Exclusions j(5) and j(6) state:

This insurance does not apply to:

. . .

j.   Damage To Property

"Property damage" to:

. . .

(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

(6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

. . .

Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard". [*sic*]

In its "Definitions" section, the insurance contract defines "products-completed operations hazard":

16. "Products-completed operations hazard":

a. Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1) Products that are still in your physical possession; or

(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

(a) When all of the work called for in your contract has been completed.

(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

Mid-Continent argues that even if none of the other exclusions were to apply, exclusions j(5) and j(6) would prevent coverage. Mid-Continent acknowledges that these exclusions apply only to property damage that occurred while work was ongoing, not damage to completed work. *See Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 213 (5th Cir. 2009); *see also Lamar Homes*, 242 S.W.3d at 11.

Mid-Continent argues that under the Crownovers' theory, the damage to both the foundation and the HVAC system occurred at the time they were installed, and that both were installed before construction of the home was completed.  The Crownovers contend that the damage to tangible property occurred in early 2003, after construction was complete and during the coverage period.  "[T]he key date [for insurance coverage] is when injury happens, not when someone happens upon it." *Don's Bldg. Supply*, 267 S.W.3d at 22.  The Crownovers provided affidavits and testimony indicating that the foundation-related elements and HVAC system of the home were initially satisfactory when they moved in in late 2002.  The uncontested evidence indicates that the first cracks appeared shortly after the Crownovers moved into their home, thus after work was completed.  "The cracks are not merely a warning of prior undiscovered damage; they are the damage itself.  It is of no moment that the faulty foundation work occurred in 1999, or that the damage was discovered in 2005; it matters only that damage was alleged to have occurred in 2005." *Wilshire*, 581 F.3d at 225.  Therefore, the damage to the foundation occurred at the time that the cracks actually appeared, not when the foundation was improperly designed or installed. *See id.*

Similarly, the Crownovers contend that they limited their damage request to the replacement of the HVAC units, which were originally satisfactory but subsequently ran excessively starting in early 2003.  There is no evidence that the HVAC units were strained and required replacement when they were first installed, or indeed at any time before Arrow had finished its work on the home.  In sum, because neither the foundation nor the HVAC system was damaged until after construction on the home was complete, exclusions j(5) and j(6) do not prevent indemnity.

No. 11-10166

## CONCLUSION

For the foregoing reasons, we REVERSE the grant of summary judgment for Mid-Continent, RENDER summary judgment for the Crownovers, and REMAND for calculation of legal fees.